**MICHAEL A. CISNEROS**
ATTORNEY AT LAW
50 WEST LEMON AVENUE
SUITE 12
**MONROVIA, CALIFORNIA 91016**
(626) 359-3692 FAX: (626) 359-3728

**Michael A. Cisneros, SBN 105483**
mcisneros@mac.com

Attorneys for Debtors-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Chapter 11 |
| JAMES N. KNOWLES and SARA KNOWLES, | CASE NO. 2:10-bk-11762ER |
| Debtors-in-Possession | NOTICE OF MOTION AND MOTION FOR AUTHORITY FOR INTERIM USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF JAMES N. KNOWLES, IN SUPPORT THEREOF |
| | Date:<br>Time:<br>Place: |

TO THE HONORABLE ERNEST ROBELES, UNITED STATES BANKRUPTCY JUDGE:

James N. Knowles and Sara Knowles, the debtors and debtors-in-possession herein ("Debtors"), hereby move the Court, for an Order: (1) authorizing Debtors' the use of cash collateral, on an interim basis, pending a final hearing, in such amounts as are necessary to enable the Debtors to maintain the two parcels of income producing real property in such a way as to avoid immediate and irreparable harm to the estate; (2) granting a replacement lien to each of the Debtors' respective secured creditors on account of the Debtors' use of cash collateral; (3) scheduling and establishing deadlines regarding a final hearing on the Debtors' use of cash collateral on a permanent basis; and (4) following such final hearing, authorizing on a permanent basis the

1

1    Debtors' use of cash collateral in the ordinary course of their businesses during the pendency of this

2    Chapter 11 proceeding (the "Motion").

3       This Motion is made and based upon the following grounds: The immediate use of cash

4    collateral is essential to enable the Debtors to maintain the two parcels of real property owned by the

5    estate and located at 2020 Newport Avenue, Pasadena, California and 1224 Corson Street, Pasadena,

6    California. The interests of each of the secured lenders are adequately protected by continuing liens

7    in the rental income generated by the properties. Adequate protection is further provided by the use

8    of the rental income to maintain of the properties. Additionally, adequate protection is also provided

9    by the maintenance of the collateral package by the Debtors with a value equal to the value of the

10    collateral on the petition date.

11       By this Motion, the Debtors seek authorization for the use of cash collateral on an interim

12    basis until a final hearing can be held on their request for authorization to use cash collateral on a

13    permanent basis. The Debtors request that a final hearing regarding the use of cash collateral be

14    scheduled pursuant to *F.R.B.P. Rule 4001(b)(2)* at the earliest available date that is no sooner than 15

15    days from the date of the hearing on this emergency Motion.

16       Pursuant to the requirements of *F.R.B.P. Rule 4001(b)(1)(B),* the following is a summary of

17    the relief requested herein:

18       (i)     Entities with Interests in Cash Collateral:

19    On the Real Property located at 2020 Newport Avenue, Pasadena, California:

20    (1)     GMAC Mortgage; and

21    (2)     Countrywide Home Loans;

22    On the Real Property located at 1224 Corson Street, Pasadena, California:

23    (3)     GMAC Mortgage; and

24    (4)     Countrywide Home Loans.

25       Hereafter the foregoing 4 secured creditors shall collectively be referred to as the "Lenders."

26    The Lenders have loans evidenced by either a Promissory Note (i.e. the two GMAC loans) or Home

27    Equity Lines of Credit Agreements (i.e. the Countrywide loans) and each are secured by separate

28    Deeds of Trust recorded against the respective properties, true and correct copies of which are

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692  FAX: (626) 359-3728

2

1 | attached to the Declaration of James N. Knowles, respectively marked Exhibits "1", "2", "3", "4",

2 | "5", "6", "7" and "8", and incorporated herein by this reference. In addition to holding liens on the

3 | Debtors' real properties, each Lender has also received a lien on the rental income generated by each

4 | real property securing their respective liens.

5 |       (ii)    Purpose of Use of Cash Collateral:

6 |      The Debtors seek authority to use cash collateral for the payment of ordinary post-petition

7 | expenses, professional fees and administrative expenses including U.S. Trustee fees, and including

8 | all expenses necessary to maintain the properties owned by the Debtors.

9 |      (iii) Material Terms, Including Duration, of the Use of Cash Collateral:

10 |      On an interim basis pending a final hearing as provided by *F.R.B.P. Rule 4001(b)(2),* on a

11 | permanent basis thereafter, subject to periodic review by the Court.

12 |       (iv)    Adequate Protection Offered:

13 |      The Debtors proposes to provide adequate protection to the secured creditors by way of

14 | continuing liens on all post-petition rental income and maintenance of the collateral package with a

15 | value equal to the value of the collateral on the petition due.

16 |      Good Cause Exists for Hearing this Motion on an Emergency or Shortened Time Basis.

17 | Obtaining the immediate use of cash collateral is essential to enable the Debtors to continue to

18 | maintain the real properties. The Debtors generate employment income, which is used to pay their

19 | regular, everyday living expenses however it is insufficient to maintain the real properties. The only

20 | other source of income for the Debtors is the rental income generated by the real properties, and the

21 | Debtors cannot maintain the real properties without immediate authorization to use cash collateral to

22 | cover the normal, reasonable and necessary expenses of the real properties.

23 |      In recognition of the fact that *Section 363(c)* of the Bankruptcy Code operates to deprive a

24 | debtor of the use of critical operating capital as of the filing of the debtor's Chapter 11 petition,

25 | Congress specifically provided in *Section 363(c)(3)* that a hearing on cash collateral "shall be

26 | scheduled in accordance with the needs of the Debtor." Accordingly, the Bankruptcy Code

27 | expressly anticipates and authorizes expedited hearings on the issue of cash collateral use. See, *11*

28 | *U.S.C. §363(c)(3).*

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

3

1      Similarly, the Ninth Circuit Court of Appeals has recognized that immediate interim relief
2 may be crucial to the success of a corporate reorganization, stating:

3      We realize that "in certain circumstances, the entire reorganization effort may
4      be thwarted if emergency leave is withheld" and that reorganization under the
5      Bankruptcy Code "is a perilous process, seldom more so than at the outset of the
6      proceedings when the debtor is often without sufficient cash flow to fund essential
7      business operations." It is for this reason that Congress specified that hearings
8      concerning the use of cash collateral "shall be scheduled in accordance with the
9      needs of the debtor." (Citations omitted).

10 *In re Center Wholesale, Inc.*, 759 F. 2d 1440, 1449 n. 21 (9th Cir. 1985); See also, *In re Sullivan*
11 *Ford Sales*, 2 B.R. 350, 355 (Bankr. D. Me. 1980).

12      As is set forth in the attached Declaration of James N. Knowles (the "Knowles Declaration"),
13 without the immediate authorization to use cash collateral for ordinary operating expenses, the
14 maintenance of each of the Debtors real properties will grind to an immediate, and irreparable halt.
15 Immediate use of cash collateral is needed to allow the Debtors to pay utilities and other ongoing
16 maintenance expenses, as well as to pay the administrative expenses of this bankruptcy case.
17 Presently, Debtors' expenses for maintenance of their real properties are accruing daily. If Debtors
18 are not permitted the immediate use of cash collateral, they will be unable to pay the normal
19 operating expenses of the real properties, such as utilities and maintenance. If Debtors are unable to
20 pay such expenses, the tenants of the Debtors apartment complexes will surely cease paying rent and
21 vacate the complexes in short order, thus destroying Debtors' income streams. In turn, the loss of
22 tenants in Debtors' apartment complexes would have an immediate and significantly negative effect
23 on the market values of Debtors' real properties.

24      In light of the foregoing facts and circumstances, it is imperative that the Court set a hearing
25 on the instant Motion as soon as possible.

26 ///
27 ///
28 ///

4

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE (2
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

1       This Motion is based on the following Memorandum of Points and Authorities, the Knowles

2   Declaration, and exhibits, appended hereto, all pleadings, papers, and records on file with the Court,

3   and such other evidence, oral or documentary, as may be presented to the Court in connection with

4   this Motion and the hearing hereon.

5       WHEREFORE, the Debtors respectfully request that this Court enter its order as follows:

6       A.    Authorizing Debtors' use of cash collateral on an interim basis pursuant to the terms

7   and conditions contained in this Motion, until such time as a final hearing can be held on this Motion

8   upon notice to creditors and parties in interest;

9       B.    Granting a replacement lien to the Debtors' secured creditors, and the other adequate

10   protection as described in this Motion, on account of the Debtors' use of cash collateral;

11       C.    Scheduling a final hearing on this Motion;

12       D.    Authorizing the permanent use of cash collateral following a final hearing on this

13   Motion; and

14       E.    For such other and further relief as the Court may deem just and proper.

15   Date: March 12, 2010

**MICHAEL A. CISNEROS**
**Attorney at Law**

By:

**Michael Anthony Cisneros**
Attorneys for Debtors and Debtors in Possession
James N. Knowles and Sara Knowles

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

16

17

18

19

20

21

22

23

24

25

26

27

28

Motion for Authority to Use Cash Collateral, etc.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

### Statement of Facts

A.    Jurisdiction and Venue

The Debtors' Chapter 11 case was commenced by the filing of a Voluntary Petition on January 18, 2010 (the "Petition Date"). The Debtors continue to manage their assets as debtors-in-possession pursuant to *11 U.S.C. §§1107 and 1108*. No trustee or examiner has been appointed in the Debtors' bankruptcy case. The Court has jurisdiction over this matter pursuant to *28 U.S.C. §§157 and 1334*. This is a core proceeding pursuant to *28 U.S.C. §157(b)(2)*. Venue of the Debtors' Chapter 11 case is proper pursuant to *28 U.S.C. §§1408 and 1409*.

B.    Background and General Description of the Debtors.

The Debtors have lived in Southern California all of their lives and have personally managed the two parcels of rental property comprising their estate.

The Debtors are individuals who, in more prosperous times, invested in rental real properties, taking advantage of the various lending opportunities which existed in the early 2000s. Although the Debtors did invest in rental properties, they maintained their respective employments and spent their spare time managing and maintaining the income properties. The Debtors were not, in any way, professional property managers nor sophisticated real estate investors, but were simple, hard working individuals, who were presented with what they perceived to be a good investment opportunity which might raise their standard of living and provide them with a comfortable retirement. As so many other real estate investors came to realize, the Southern California real estate market was not the panacea proclaimed, and the precipitous decline in property values and rents caused a major cash flow crunch for the Debtors.

When property values and rentals declined, the Debtors attempted to obtain refinancing of the properties in order to get rates and terms more consistent with the market place. The Debtors, or more appropriately the properties, could not qualify for the loans, leaving the Debtors facing substantial increases in the principal amount of their loans, interest rates and payments. The decline in rental income left the Debtors' with insufficient income to meet their expenses.

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

6

1  The Debtors felt pressured to maintain their lifestyle and used unsecured credit to pay many
2  of their everyday living expenses, to keep real estate taxes current and to essentially maintain the
3  properties. The effect of this increased debt was to exacerbate their cash flow problems, causing
4  them to default on credit card payments. The Debtors had begun a fast and tight spiral down a
5  financial rabbit hole, leading them to completely unknown and unchartered areas for them.

6  The Debtors elected to file a Voluntary Petition under Chapter 7 of the United States
7  Bankruptcy Code, in order to discharge all of their debt, so as to clear the landscape and allow them
8  to analyze their financial situation to determine if there was any way to salvage their investments in
9  the rental properties. The Debtors filed their Chapter 7 Petition on April 22, 2009 and received a
10  Discharge on December 10, 2009.

11  Prior to the filing of the Debtors' Chapter 7 Bankruptcy Petition, the Debtors had submitted a
12  Loan Modification Package to their lender on the family residence located at 372 Laun Street,
13  Altadena, CA. Their lender, Washington Mutual Bank, was purportedly processing the Loan
14  Modification request for over six (6) months. Washington Mutual Bank never came to a decision to
15  either allow or reject the Debtors loan modification request. Despite such, the Debtors have
16  maintained their payments and are current with this lender.

17  While the Debtor's Loan Modification request was pending with Washington Mutual Bank,
18  the senior lenders on the rental properties (coincidentally each being GMAC Mortgage), commenced
19  their foreclosures on the properties by recording Notices of Default on September 21, 2009 (on the
20  Newport property) and on March 18, 2009 (on the Corson property). The Debtors, ever hopeful that
21  Washington Mutual would approve their Loan Modification request, waited as long as possible
22  before filing their Chapter 7 Petition.

23  After their Chapter 7 filing, the Debtors requested loan modifications on the senior loans on
24  the rental properties, hoping to avoid an increase in the principal balance of their loans, an increase
25  in their interest rates and an increase in their monthly payments. Despite the efforts of the Debtors
26  to obtain loan modifications and their diligent submission of financial information to the lenders, no
27  decision was ever reached by GMAC.

28  ///

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

7

C.    Events Leading to the Debtors' Bankruptcy Filings, and Parties with an Interest in Cash Collateral

After the Debtors received their discharge in Chapter 7, the senior lender on the Newport Avenue property set a Trustee's Sale for January 21, 2010. The Debtors, hoping to "force" a loan modification on the secured lenders elected to file a Voluntary Petition under Chapter 11 and reorganize their secured debt to reflect the true value of the real properties and to compel the imposition of a market fixed rate of interest.

The lack of financing currently available in the market has virtually eliminated the ability of most buyers to acquire income properties. As such, the Debtors have made what they believe to be a prudent business decision to retain ownership of their real properties as it is almost never a sound decision to sell in a down market. However, because of the current economic conditions, refinancing the Debtors' properties has proven impossible, forcing the Debtors to default on obligations owed to their secured institutional lenders.

The economic challenges currently being faced by the Debtors are not unique. In order to reorganize their financial affairs and maintain ownership and control of their real properties, the Debtors, on January 18, 2010, filed a Voluntarily Petition under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Court").

D. Purpose For Use of Cash Collateral.

By this Motion, the Debtors seek authorization to use cash collateral to pay the normal and usual expenses of the maintenance of their real properties, and administrative expenses of their estate. The Debtors propose that they be allowed to use cash collateral for ordinary post-petition operating expenses, professional fees and administrative expenses including U.S. Trustee fees.

E.    The Debtors' Cash Collateral Proposal.

Debtors propose to use funds claimed as cash collateral by the Lenders in connection with the maintenance of the rental real properties

As adequate protection and for Debtors' use of any cash collateral of the Lenders, each of the Lenders will be entitled to continuing liens on the rental income generated by each property in which

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

8

1  the lender has a security interest, to the same extent and priority as any duly perfected and
2  unavoidable liens in cash collateral held by the respective Lenders as of the Petition Date.

3  Debtors and all other parties in interest will reserve any and all rights that they may have to
4  object to the claims of the Lenders and to object to the validity, priority and extent of the respective
5  lien(s), if any, encumbering the Debtors' assets claimed by each of the Lenders.

6  Debtors reserve the right to seek, at the final hearing on this Motion, use of cash collateral
7  different from that set forth herein.

8  **II.**

9  **PURSUANT T O *11 U.S.C. §363*, DEBTORS SHOULD BE AUTHORIZED TO USE CASH**
10  **COLLATERAL AND THE INTERESTS OF THE LENDERS ARE ADEQUATELY**
11  **PROTECTED**

12  A.    The Provision of "Adequate Protection."

13  *Bankruptcy Code §363(a)* defines "cash collateral" as "cash, negotiable instruments,
14  documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in
15  which the estate and an entity other than the estate have an interest…"

16  *Section 363(c)(2)* provides that the debtor in possession may not use cash collateral unless,
17  "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and
18  a hearing, authorizes such use, sale or lease in accordance with the provisions of this section."

19  *Section 363(e)* provides that "on request of an entity that has an interest in property used,
20  sold or lease…the court, with or without a hearing, shall prohibit such use, sale or lease as is
21  necessary to provide adequate protection of such interest."

22  *Section 361 of the Bankruptcy Code* provides that adequate protection must protect an entity
23  against any use of collateral that decreases the value of such entity's interest in such collateral.
24  Although *Section 361* does not define "adequate protection", the proposal for adequate protection
25  made herein fits squarely within the meaning of "adequate protection" as defined by the United
26  States Supreme Court in *United States Ass'n of Texas v. Timbers of Inwood Forest Assoc.,* 484 U.S.
27  365, 108 S. Ct. 626, 98 L.Ed.2d 740 (1988) (hereafter "*Timbers*") and its progeny, as discussed in
28  detail below.

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

9

1    The Bankruptcy Code clearly delineates the party who bears the burden of proof on the

2 relevant cash collateral issues. Specifically, *Bankruptcy Code §363(p)* provides:

3         In any hearing under this section—

4         (1)    the trustee [or debtor-in-possession] has the burden of proof on
               the issue of adequate protection; and
5         (2)    the entity asserting an interest in property has the burden of
6               proof on the issue of the validity, priority, or extent of such interest.

7    Therefore, in light of the foregoing authorities, it is clear that the Court may authorize the

8 Debtors' use of any cash collateral of the Lenders upon determining that the interests of the Lenders

9 in the cash collateral will be adequately protected. *In re McCombs Properties VI, Inc.,* 88 B.R. 261

10 (Bankr. C.D. Cal. 1988).

11    *Section 361 of the Bankruptcy Code* explicitly provides that "adequate protection may be

12 provided by...[a] replacement lien to the extent that such...use [of cash collateral] results in the

13 decrease in the value of such entity's interest in such property." *11 U.S.C. §361(s)*; *See Timbers*, 484

14 U.S. at 370, 108 S. Ct. at 730.

15    In *Timbers*, the Unites States Supreme Court analyzed and quantified the parameters of the

16 "interest in property" referenced in Sections 361, 362(d)(1) and 363(e), which the Bankruptcy Code

17 undertakes to protect, where required, through the provision of adequate protection. This analysis led

18 the Supreme Court in *Timbers* to the conclusion that the "interest in property" referenced in the

19 above sections of the Bankruptcy Code means, and is limited to, the "value of the collateral."

20 (*Timbers*, 484 U.S. at 370). Therefore, under the *Timbers* analysis, the adequate protection

21 provisions in the Bankruptcy Code protect a secured creditor only from a *diminution in the value of*

22 *that secured creditor's collateral during the post-petition period. (Id.).* In other words, the Supreme

23 Court made it clear in *Timbers* that the interest of a secured creditor, even an undersecured creditor,

24 is adequately protected if the value of the creditor's interest in the collateral is maintained. (*Id.*).

25 Furthermore, where the creditor is undersecured, it is not entitled to payment of interest on its claim

26 to assure adequate protection. *Id.,* at 370-372 and 382.

27    The "value" oriented adequate protection analysis adopted by the Supreme Court in *Timbers*

28 has been closely adhered to by the courts which have subsequently had occasion to address the issue.

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

10

1   *See, E.g., In re Ledgemere Land Corp.,* 116 B.R. 338, 343 (Bankr. D. Mass. 1990)(Holding that so

2   long as the receivables being collected and used by the debtor are being replaced by sufficient new

3   receivables in which the creditor is granted a security interest, the creditor is adequately protected.);

4   *In re Johnson,* 90 B.R. 973, 98 (Bankr. D. Minn. 1988)(Holding that secured creditor is not impaired

5   and is not entitled to receive adequate protection payments where value of collateral does not

6   decline.); *In re Century Inv. Fund, VII Ltd. Partnership,* 96 B.R. 884, 887 (Bankr E.D. Wis.

7   1989)(Holding that where the value of collateral appears to be stable, the secured creditor was not

8   entitled to adequate protection payments.); *In re Anderson,* 88 B.R. 877, 889 (Bankr. N.D. IN

9   1988)(Holding that secured creditor was required to show a necessity for adequate protection

10  payments by demonstrating a decline in asset value from the petition date.); *In re Kessler,* 86 B.R.

11  134, 136 (Bankr. C.D. Ill. 1988)(Holding that under *Timbers*, movants were not entitled to adequate

12  protection payments because there was no showing that the collateral property was depreciating in

13  value).

14  　　　In the case of *In re Elmore,* 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988), the Court held:

15  　　　　　　[T]he Court finds that the property is not depreciating in value. In

16  　　　　　　consequence, the court finds that Lomas [Secured Creditor] is adequately

17  　　　　　　protected by the value of its collateral… The right to receive payments is a

18  　　　　　　simple contract right, that supports only a claim in the bankruptcy case. There

19  　　　　　　is no other adequate protection to which Lomas is entitled under the

20  　　　　　　Bankruptcy Code.

21  　　　In the case of *In re McCombs, supra,* 88 B.R. at 266, the Honorable John E. Ryan held that:

22  　　　　　　The analysis of the Supreme Court in *Timbers* is instructive here. The phrase

23  　　　　　　"interest in property" in §363(e) means the value of the collateral. That is the

24  　　　　　　interest that I am required to protect. If that value is likely to diminish during

25  　　　　　　the time of the use, adequate protection must be provided by the Debtor.

26  *Accord, In re Delta Resources, Inc.,* 54 F.3d 722, n730 (11th Cir.), *cert. denied,* 64 U.S.L.W. 3348

27  (1995); *In re Westchase I, L.P.,* 126 B.R. 692, 694-95 (Bankr. W.D. NC 1991).

28  ///

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

11

1      Under strict value-oriented analysis adopted by the Supreme Court in *Timbers* (and adhered

2  to in the well-reasoned cases cited above), the adequate protection inquiry under Section 363(e) is

3  limited to determining whether the debtor's use of a secured creditor's cash collateral will reduce the

4  value of the creditor's collateral base. If the proposed use of the collateral will not cause a decline in

5  the value of the collateral, then court authorization of such use is appropriate.

6      Not infrequently, a secured creditor will contend that it somehow has a right to be paid

7  adequate protection payments, post-petition, even where no decline in the value of the collateral is

8  either occurring or anticipated. The Supreme Court in *Timbers* expressly rejected such a contention,

9  stating:

10              It is true that under §1129(b) a secured claimant has a right to receive under a

11          plan the present value of his collateral. This entitlement arises, however, not

12          from the phrase "indubitable equivalent" in §1129(b)(2)(A)(iii), but from the

13          provision of §1129(b)(2)(A)(i)(II) that guarantees the secured creditor

14          "deferred cash payments...of a value, *as of the effective date of the plan,* of at

15          least the value of such [secured claimant's] interest in the estate's interest in

16          such property." (Emphasis added.) Under this formulation, even thought the

17          undersecured creditor's "interest" is regarded (properly) as solely the value of

18          the collateral, he must be rendered payments that assure him that value *as of*

19          *the effective date of the plan.* In §361(3), by contrast, the relief pending the

20          stay need only be such "*as will result in the realization...* of the indubitable

21          equivalent" of the collateral. (Emphasis added.) It is obvious (since §§361

22          and 362(d)(1) do not entitle the secured creditor to immediate payment of the

23          principal of his collateral) that this "realization" is to "result" not at once, but

24          only upon completion of the reorganization. It is *then* that he must be assured

25          "realization... of the indubitable equivalent" of his collateral. To put the

26          point differently: similarity of outcome between §361(3) and §1129 would be

27          demanded only if the former read "such other relief...as will give such entity,

28

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

12

1    *as of the date of the relief,* the indubitable equivalent of such entity's interest

2    in such property.

3  *Timbers, supra,* 484 U.S. 377.

4    The law, then, is clear: no adequate protection payments are required unless there is a decline

5  post-petition in the value of the secured creditor's collateral which actually impairs the creditor's

6  secured claim. As is set forth in detail herein, and as is evidenced by the attached Knowles

7  Declaration, Debtors' proposal to use any cash collateral of the Lenders provides adequate protection

8  to the Lenders.

9  B.    Debtors Have Satisfied their Adequate Protection Burden through the Provision of

10  Replacement Liens.

11    Section 361 of the Bankruptcy Code explicitly provides that "adequate protection may be

12  provided by...[a] replacement lien to the extent that such...use [of cash collateral] results in the

13  decrese in the value of such entity's interest in such property." 11 U.S.C. Section 361(2); *See*

14  *Timbers,* 484 U.S. at 370.

15    Under Debtors' cash collateral proposal, the Lenders' interests in any cash collateral will be

16  adequately protected from a diminution in value through continuing liens granted to Lenders and

17  through the maintenance and preservation of the collateral and the Debtors' operations.

18    Under Debtors' proposal, each Lender will be granted a continuing lien on the rental income

19  constantly being generated and regenerated on a monthly basis by each property in which each

20  Lender has a security interest, to the same extent and priority as any duly perfected and unavoidable

21  liens in cash collateral held by the respective Lenders as of the Petition Date.

22    Since the function of adequate protection is only to preserve and not to increase the collateral

23  subject to a secured creditor's interest, any additional value created through Debtors' use of the cash

24  collateral, whether in the form of additional cash, inventory or accounts receivable, will not be

25  subject to a replacement lien, but will instead constitute an unencumbered asset of the applicable

26  Debtors' bankruptcy estate that all creditors will ultimately be able to look to for payment. *See,*

27  *Ledgemere, supra,* 116 B.R. at 343(Holding that so long as receivables being collected and used by

28  the debtor are being replaced by sufficient new receivables in which the creditor is granted a security

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

13

1 | interest, the creditor is adequately protected.). Thus, the Lenders' replacement liens should be

2 | limited to the amount of any cash collateral in existence as of the Petition Date.

3 | In support of their proposed use of cash collateral, Debtors have prepared the preliminary

4 | operating projections attached as Exhibit "9" to the Knowles Declaration. The projections are, by

5 | necessity, preliminary in nature, and the Debtors expect to be able to present refined and improved

6 | projections in the near future. Notwithstanding the preliminary nature of the operating projections,

7 | the Debtors believe that the business assumptions underlying them are reasonable and are essentially

8 | in accordance with Debtors' historical operational performance, as adjusted to take into account

9 | recent or projected events (*e.g.*, the downturn in the economy, etc.). Accordingly, Debtors believe

10 | that the projections establish that the proposed replacement liens being granted to the Lenders will

11 | adequately protect the Lenders' alleged interests.

12 | In summary, the attached Declaration provides evidence to establish with a reasonable basis

13 | for concluding that any use of any cash collateral of the Lenders will not result in a net decrease in

14 | he value of the collateral of each Lender, as that value existed on the petition date. The Lenders'

15 | interests in cash collateral are therefore adequately protected, and the Debtors should be permitted

16 | the use of cash collateral as herein requested.

17 | C.    The Lenders Are Adequately Protected by the Maintenance and Preservation of Debtors'

18 | Businesses.

19 | To determine the sufficiency of adequate protection, a bankruptcy court should: (i) establish

20 | the value of the secured creditor's interest; (ii) identify the risk, if any, to the value of the secured

21 | creditor's cash collateral resulting from the debtor's proposed use of cash collateral; and (iii)

22 | determine whether the debtor's adequate protection proposal protects the value of the cash collateral

23 | as nearly as possible against risk to that value consistent with the concept of indubitable equivalence.

24 | *McCombs, supra,* 86 B.R. at 267.

25 | To establish the value of a secured creditor's interest, the bankruptcy court must consider the

26 | purpose of the valuation, and the proposed disposition or use of the secured property. *See,* 11 U.S.C.

27 | §506(a). "One of the primary factors to be considered in valuation is whether the subject property is

28 |

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

14

1  to be used and retained by the debtor or whether the property is to be disposed of." *In re Kidsstop of*

2  *America, Inc.,* 64 B.R. 397, 401 (M.D. Fla. 1986).

3      Here, the value of each Lender's collateral is highly dependent upon the maintenance of the

4  Debtors' real properties.  It is therefore imperative that the Debtors be allowed to utilize cash

5  collateral to continue to maintain the properties in order to prevent any deterioration in the value of

6  the collateral. *See, In re Stein,* 19 B.R. 458, 460 (Bankr. E.D. Pa 1982) (Allowing debtor to use cash

7  collateral where the secured party had no equity cushion for protection, finding that the use of cash

8  collateral was necessary to the continued operation of the debtor, and that the creditor's 'secured

9  position can only be enhanced by the continued operation of the [debtor's business]."); *In re Pine*

10  *Lake Village Apartment Co.,* 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982)(Authorizing debtor to use

11  cash collateral generated from rental income to preserve the value of real property which also

12  secured creditor's claim.); *In re Karl A. Neise,* 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981)(Finding that

13  marginally secured creditor was adequately protected by lien in post-petition property acquired by

14  the debtors, and authorizing debtors' use of cash collateral "in the normal operation of their

15  businesses.").

16      As set forth in the Knowles Declaration, even a temporary cessation of Debtors' ability to

17  maintain the real properties, caused by any lack of access to cash collateral, will result in a

18  substantial diminution of each Lender's collateral, as tenants may refuse to pay further rent, may

19  vacate the Debtors' respective real properties and will, ultimately, result in a dramatically lower

20  current fair market value for each of the Debtors' real properties.  In contrast, maintenance of the

21  Debtors' ongoing operations will preserve the value of the Lenders' interests in cash collateral as

22  nearly as possible against any risk to that value because it will preserve the income streams

23  generated by the properties, and it will also preserve the value of the Debtors' real properties

24  themselves, thus providing adequate protection to the Lenders.

25  ///

26  ///

27  ///

28  ///

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

15

D.      The Debtors Should Be Authorized to Use Cash Collateral in Order to Promote a Successful Reorganization.

In the case of *In re O'Connor,* 808 F.2d 1393 (10th Cir. 1987), the Tenth Circuit Court of Appeals recognized that the ultimate goal of Chapter 11 proceedings is to enhance the prospects of reorganization. In this regard, the Tenth Circuit States as follows:

> [T]he debtors' efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all of the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end... In order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard."

(*Id.* at 1397-98); *Accord, In re Dynaco Corp.,* 162 B.R. 389, 395 (Bankr. D. NH 1993)("[T]he court will generally permit the business operations to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections..."); *In re Heatron, Inc.,* 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980)("At the beginning f the reorganization process, the court must work withless evidence than might be desirable and should resolve all issues in favor of the reorganization where the evidence is conflicting.").

Here, a determination to grant the Debtors' use of cash collateral will help promote Debtors' successful reorganization, as it will allow Debtors to continue, uninterrupted, the normal operations and maintenance of the properties. Debtors' efforts to successfully reorganize their financial affairs will ultimately benefit the Lenders by preserving and enhancing the value of their alleged security interest in both cash collateral as well as the Debtors' real properties. In *Cann & Saul, supra,* the court found the Debtors' prospects for a successful reorganization to be a major factor in the determination of adequate protection, stating:

> It is far more significant in the weight of considerations as to whether a creditor is "adequately protected" to analyze debtor's prospects for a

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

16

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

1  successful reorganization in Chapter 11. If these prospects are strong…then

2  the measure of the secured creditor's adequate protection is the probability

3  that the debtor will be able to propose an effective plan. *Cann & Saul, supra,*

4  76 B.R. at 485.

5  In *Cann & Saul,* the debtor (a steel manufacturer that had been in business for almost a

6  century) had been losing money each year for a period of at least four years prior to the filing of its

7  Chapter 11 petition. However, the court found that the debtor had strong potential for reorganization,

8  given such factors as the debtor's production of high quality product, the debtor's stability and good

9  public image, and the debtor's acceptance of changes necessary for maintaining its labor force. *Id.* at

10  487-88.

11  If the Debtors are denied the use of cash collateral, they will be forced to immediately cease

12  the maintenance of the apartment complex that they own and operate, Debtors' tenants would be

13  forced to move from their current homes, and the value of Debtors' real properties would decrease

14  because they no longer constituted going concerns generating income.    Such a cessation of

15  operations, even temporarily, would cause irreparable damage to the Debtors' operations in the form

16  of lost tenants, lost revenues and loss of goodwill.    Further, if Debtors were to be denied the use of

17  cash collateral, their assets would need to be liquidated (in a down market), yielding proceeds

18  totaling a fraction of what Debtors could generate by continuing operations and reorganizing their

19  financial affairs.    Rather than force Debtors and their creditors to such a result at this early stage of

20  the cases, the Court should permit Debtors to use cash collateral in order to preserve the value of

21  their assets and to reorganize. *See, In re George Ruggiere Chrysler-Plymouth, Inc.,* 727 F.2d 1017,

22  1019 (11th Cir. 1984) ("Without the availability of cash to meet daily operating expenses such as

23  rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure

24  would be frustrated."); *Dynaco, supra* 162 B.R. at 396 (Finding that the alternative to the debtor's

25  use of cash collateral—forced termination of its businesses—would doom any reorganization and

26  any chance to maximize values for all creditors.).

27  In light of the foregoing facts and circumstances, Debtors believe that it is clear that the

28  continued operation of their businesses, and the maintenance of their real properties, will provide

17

1  adequate protection to the Lenders such that the Court should authorize Debtors' use of cash

2  collateral as requested herein.

3       WHEREFORE, the Debtor respectfully requests that this Court enter its order as follows:

4       A. Authorizing Debtors' use of cash collateral on an interim basis pursuant to the terms and

5  conditions contained in this Motion, until such time as a final hearing can be held on this Motion

6  upon notice to creditors and parties in interest;

7       B. Granting a replacement lien to the Debtors' secured Lenders, and the other adequate

8  protection as described in this Motion, on account of the Debtors' use of cash collateral;

9       C. Scheduling a final hearing on this Motion;

10       D. Authorizing the permanent use of cash collateral following a final hearing on this Motion;

11       E. For such other and further relief as the Court may deem just and proper.

12  Date: March 12, 2010

**MICHAEL A. CISNEROS**
**Attorney at Law**

By: _____

    **Michael Anthony Cisneros**
    Attorneys for Debtors and Debtors in
    Possession
    James N. Knowles and Sara Knowles

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

18

1  **DECLARATION OF JAMES N. KNOWLES**

2    I, James N. Knowles, hereby declare:

3    1.    I am one of the Debtors and Debtors in Possession in the above-entitled Chapter 11

4  cases (hereafter collectively the "Debtors"). I am an individual over the age of eighteen years and

5  am competent to make this declaration. The following matters are known to me personally and are

6  believed by me to be true and correct and, if called upon as a witness, I could and would

7  competently testify thereto.

8    2.    The immediate use of cash collateral is essential to enable us to maintain our rental

9  real properties located at 2020 Newport Avenue Property, Pasadena, California and 1224 Corson

10  Street, Pasadena, California. The entities with interests in the Debtors' cash collateral are:

11    On the 2020 Newport Avenue Property:  (1) GMAC Mortgage and (2) Countrywide Home

12  Loans;

13    On the 1224 Corson Street Property:  (3) GMAC Mortgage and (4) Countrywide Home

14  Loans.

15  Hereafter the foregoing secured creditors shall collectively be referred to as the "Lenders."

16    3.    The Lenders have loans evidenced by either a Promissory Note (i.e. the two GMAC

17  loans) or Home Equity Lines of Credit Agreements (i.e. the Countrywide loans) and each are

18  secured by separate Deeds of Trust recorded against the respective properties, true and correct copies

19  of which are attached to the Declaration of James N. Knowles, respectively marked Exhibits "1",

20  "2", "3", "4", "5", "6", "7" and "8", and incorporated herein by this reference. In addition to

21  holding liens on the Debtors' real properties, each Lender has also received a lien on the rental

22  income generated by each real property securing their respective liens.

23    4.    Good cause exists for hearing this Motion on an emergency basis. Obtaining the

24  immediate use of cash collateral is essential to enable the Debtors to continue to maintain the real

25  properties. Debtors generate cash collateral, and the Debtors cannot continue to maintain the real

26  properties without immediate authorization to use cash collateral to cover the normal, reasonable and

27  necessary expenses of their operations. Without immediate authorization to use cash collateral for

28  ordinary operating expenses, utilities and other ongoing operating expenses, as well as to pay the

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

19

1   administrative expenses of this bankruptcy case. Presently, expenses associated with Debtors'
2   continued operation of their businesses are accruing daily.

3       5.      Similarly, if Debtors are not permitted the immediate use of cash collateral, they will
4   be unable to pay normal operating expenses such as utilities and maintenance for their apartment
5   complexes. If Debtors are unable to pay such expenses, the tenants of Debtors apartment complexes
6   will surely cease paying rent and vacate the complexes in short order, thus destroying Debtors'
7   income streams. In turn, the loss of tenants in Debtors' apartment complexes would have an
8   immediate and significantly negative effect on the market values of Debtors' real properties.

9       6.      The Debtors' Chapter 11 case was commenced by the filing of a voluntary petition on
10  January 18, 2010 (the "Petition Date"). The Debtors continue to manage their assets as debtors-in-
11  possession. No trustee or examiner has been appointed in the Debtors' bankruptcy case.

12      7.      The Debtors are individuals who own and operate one multi-family residential
13  apartment building in Pasadena, California and a single family residence in Pasadena, California.

14      8.      The Debtors have lived in Southern California all of their lives. The Debtors have
15  personally managed the real properties.

16      9.      Debtors propose to use funds claimed as cash collateral by the Lenders in connection
17  with the maintenance of the rental real properties.

18      10.     As adequate protection and for Debtors' use of any cash collateral of the Lenders,
19  each of the Lenders will be entitled to continuing liens on the rental income generated by each
20  property in which the lender has a security interest, to the same extent and priority as any duly
21  perfected and unavoidable liens in cash collateral held by the respective Lenders as of the Petition
22  Date.

23      11.     Debtors and all other parties in interest will reserve any and all rights that they may
24  have to object to the claims of the Lenders and to object to the validity, priority and extent of the
25  respective lien(s), if any, encumbering the Debtors' assets claimed by each of the Lenders.

26      12.     In support of our proposed use of cash collateral, we have prepared a preliminary
27  operating projection, attached hereto as Exhibit "9". The projections are, by necessity, preliminary
28  in nature, and the Debtors expect to be able to present refined and improved projections in the near

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

20

1  future. Notwithstanding the preliminary nature of the operating projections, the Debtors believe that

2  the business assumptions underlying them are reasonable and are essentially in accordance with

3  Debtors' historical operational performance, as adjusted to take into account recent or projected

4  events (*e.g.*, the downturn in the economy, etc.).  Accordingly, Debtors believe that the projections

5  establish that the proposed replacement liens being granted to the Lenders will adequately protect the

6  Lenders' alleged interests..

7      I declare under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct to the best of my knowledge.

9      Executed this  1 2  day of March, 2010, at Monrovia, California.

*James N. Knowles*

James N. Knowles, Declarant

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692  FAX: (626) 359-3728

21

**EXHIBIT "1"**

# ADJUSTABLE RATE NOTE
### Monthly Treasury Average Index - Payment and Rate Caps

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

December 4, 2006       Los Angeles       California
  [Date]              [City]             [State]

2020 Newport Ave., Pasadena, CA  91103

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $364,000.00      (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **GreenPoint Mortgage Funding, Inc.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

**(A) Interest Rate**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 2.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the first day of **February, 2007** , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

**(C) Interest Rate Limit**

My interest rate will never be greater than **12.000%.**

**(D) Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board entitled "Selected Interest Rates (h.15)" (the "Monthly Yields").

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **three and one-half** percentage points ( **3.500 %**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

O:

OPTNOA-OA (08/06) GreenPoint Mortgage Funding, Inc.

Page 1 of 6

EXHIBIT 13

**3. PAYMENTS**

   **(A) Time and Place of Payments**
   I will pay principal and interest by making a payment every month.
   I will make my monthly payments on the first day of each month beginning on **February 1, 2007** .
I will make these payments every month until I have paid all the principal and interest and any other charges described below
that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to
interest before Principal. If, on **January 1, 2037** , I still owe amounts under this Note, I will pay those
amounts in full on that date, which is called the "Maturity Date."
   I will make my monthly payments at **P.O. Box 79363, City of Industry, CA 91716-9363**
                                                                                                                                    or
at a different place if required by the Note Holder.

   **(B) Amount of My Initial Monthly Payments**
   Each of my initial monthly payments will be in the amount of U.S. **$1,345.41** .
This amount may change.

   **(C) Payment Change Dates**
   My monthly payment may change as required by Section 3(D) below beginning on the first day of
**February, 2009** , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change
Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly
payment.
   I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided
in Section 3(F) or 3(G) below.

   **(D) Calculation of Monthly Payment Changes**
   Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be
sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date
in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The
result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different
amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be
limited to an amount that will not be more than 7.5% greater than the amount of my last monthly payment due before the
Payment Change Date.

   **(E) Additions to My Unpaid Principal**
   My monthly payment could be less than the amount of the interest portion of the monthly payment that would be
sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal
payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the
amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal.
The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate
on the interest added to Principal will be the rate required by Section 2 above.

   **(F) Limit on My Unpaid Principal; Increased Monthly Payment**
   My unpaid principal can never exceed a maximum amount equal to 110% of the Principal amount I originally
borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal
under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In
that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new
monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid
principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding
month.

   **(G) Required Full Payment**
   On 02/01/2012 and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment
as my monthly payment until my monthly payment changes again.  I will also begin paying the Full Payment as my monthly
payment on the final Payment Change Date.

OPTNCA-OA (08/08) GreenPoint Mortgage Funding, Inc.
Page 2 of 6

14

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 10       calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    **6.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

CPTNOA-OA (08/08)  GreenPoint Mortgage Funding, Inc.
Page 3 of 5

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

16

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Sara Knowles_ _____ (Seal)          _James N Knowles_ _____ (Seal)
**Sara Knowles**              -Borrower      **James N Knowles**              -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                   -Borrower

*[Sign Original Only]*

OPTNOA-OA (06/06)  GreenPoint Mortgage Funding, Inc.
Page 6 of 6

17

**EXHIBIT "2"**

Recording Requested By:
GreenPoint Mortgage Funding,
Inc.
Return To:
GreenPoint Mortgage Funding,
Inc.
981 Airway Court, Suite E
Santa Rosa, CA 95403-2049


Prepared By:
GreenPoint Mortgage Funding,
Inc.
100 Wood Hollow Drive,
Novato, CA 94945

_____[Space Above This Line For Recording Data]_____

# DEED OF TRUST

MIN 100013800913059206


## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated December 4, 2006
together with all Riders to this document.
(B) "Borrower" is James N Knowles  and Sara  Knowles, Husband And Wife as
joint tenants




Borrower's address is 372 Laun, Altadena, CA 91001
. Borrower is the trustor under this Security Instrument.
(C) "Lender" is GreenPoint Mortgage Funding, Inc.

Lender is a Corporation
organized and existing under the laws of the State of New York

5920

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3005 1/01

⊕ -6A(CA) (0207).01
Page 1 of 15

VMP Mortgage Forms, Inc.

CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL HEREOF.
FIDELITY NATIONAL TITLE COMPANY

BY _____

# EXHIBIT 2

1.2

Lender's address is 100 Wood Hollow Drive, Novato, CA 94945

(D) "Trustee" is Marin Conveyancing Corp.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated December 4, 2006
The Note states that Borrower owes Lender three hundred sixty-four thousand and 00/100                                                                                          Dollars
(U.S. $364,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than January 1, 2037

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |
| [ ] Occupancy Rider | [X] Interim Interest Rider | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

5920

-6A(CA) (0207).01                    Page 2 of 18                    Form 3005    1/01

CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL HEREOF
FIDELITY NATIONAL TITLE COMPANY

BY

19

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
            County                 of                Los Angeles                :
       [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]
As more particularly described in exhibit "A"attached hereto and made a part hereof.

Parcel ID Number: 5825-008-005          which currently has the address of
2020 Newport Ave.                                              [Street]
Pasadena                        [City], California 91103    [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

-6A(CA) (0207).01                    Page 3 of 15

CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL HEREOF
FIDELITY NATIONAL TITLE COMPANY

BY _____

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

5920

CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL HEREOF.
FIDELITY NATIONAL TITLE COMPANY

BY _____

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL HEREOF.
FIDELITY NATIONAL TITLE COMPANY

BY _____

22

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

5920

-6A(CA) (0207).01          Page 8 of 15

CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL HEREOF.
FIDELITY NATIONAL TITLE COMPANY

BY

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(CA) (0207).01                    Page 7 of 15

5920
CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL HEREIN
FIDELITY NATIONAL TITLE COMPANY

BY _____

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

-6A(CA) (0207).01          Page 6 of 15

5920
CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL
FIDELITY NATIONAL TITLE COMPANY

BY _____

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

5920

-6A(CA) (0207).01    Page 9 of 15

CERTIFIED TO BE A TRUE AND EXACT COPY OF THE ORIGINAL HEREOF.
FIDELITY NATIONAL TITLE COMPANY

BY

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6A(CA) (0207).01                    Page 10 of 18

5920
CERTIFIED TO BE A TRUE AND EXACT COPY OF THE ORIGINAL HEREOF.
FIDELITY NATIONAL TITLE COMPANY
BY

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

5920

-6A(CA) (0207).01                 Page 11 of 18

CERTIFIED TO BE A TRUE AND EXACT COPY OF THE ORIGINAL HEREOF FIDELITY NATIONAL TITLE COMPANY

BY

72

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL HEREOF
FIDELITY NATIONAL TITLE COMPANY
BY _____

79

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

5920

30

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _Sara Knowles_____ (Seal)
                                          **Sara Knowles**                    -Borrower

                                          _James N Knowles_____ (Seal)
                                          **James N Knowles**                 -Borrower

_____ (Seal)            _____ (Seal)
                        -Borrower                                 -Borrower

_____ (Seal)            _____ (Seal)
                        -Borrower                                 -Borrower

_____ (Seal)            _____ (Seal)
                        -Borrower                                 -Borrower

CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL HEREOF.
FIDELITY NATIONAL TITLE /COMPANY
BY _____

                                          **5920**

-6A(CA) (0207).01        Page 14 of 16        Form 3005   1/01

31

State of California
County of los Angeles

On  12/1/06                    before me,  Dany Victory. Notary public

}ss.

personally appeared

Sara Knowles, James N Knowles

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

DANY VICTORY
COMM. #1432847
NOTARY PUBLIC- CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Aug. 25, 2007

CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL HEREOF.
FIDELITY NATIONAL TITLE COMPANY

BY _____

5920

-8A(CA) (0207)01              Page 15 of 15              Form 3005  1/01

27

**EXHIBIT "3"**

# HOME EQUITY LINE OF CREDIT AGREEMENT
# AND PROMISSORY NOTE
## (SECONDARY MORTGAGE LOAN)

**Borrower's Name and Address:**

Sara Knowles James N Knowles
372 Laun
Altadena, CA 91001

**Property Serving as Security (the "Property"):**

2020 Newport Ave.
Pasadena, CA  91103

**Lender's Name and Address:**

GreenPoint Mortgage Funding, Inc.
100 Wood Hollow Drive, Novato, CA 94945

| | | |
|---|---|---|
| **No.:**   0091305938 | **Initial Advance:** $ 45,500.00 | **Maturity Date:  December 15, 2021** |
| **Date:   December 4, 2006** | **Minimum Advance:** $ 100.00 | **Billing Cycle:  Monthly** |
| **Line of Credit:** $ 45,500.00 | **Draw Period: 60 Months** | **Payment Date:  Monthly** |
| | **Repayment Period: 120 months** | |

**NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.**

**MINNESOTA BORROWERS:  THIS LINE OF CREDIT SHALL BE GOVERNED BY MINN. STAT. §47.59.**

**PENNSYLVANIA BORROWERS ONLY: THIS AGREEMENT IS SUBJECT TO THE OPEN-END PROVISIONS OF THE SECONDARY MORTGAGE LOAN ACT.**

**NOTICE TO PENNSYLVANIA BORROWERS: THIS AGREEMENT CONTAINS PROVISIONS FOR A VARIABLE INTEREST RATE.**

1.   **GENERAL TERMS AND DEFINITIONS.**  This is the Agreement establishing your Home Equity Line of Credit.

In this Agreement, many of the terms we use have special meanings:

(a)  "You," "your" and "yours" means each and all Borrowers who sign this Agreement and any persons who use the Line of Credit, jointly and severally.

(b)  "We," "us" and "our" means Lender, and its successors and assigns.

(c)  "Account" means the Line of Credit Account established by this Agreement.

(d)  "Billing Cycle" means the period of time normally covered by periodic billing statements and includes such period of time even when a statement is not sent because there is otherwise no balance in your Account for that period.

(e)  "Credit Limit" means the maximum amount of principal shown above that we will ordinarily allow you to owe us at any time under this Agreement.

(f)  "Credit Line Checks" means the checks used to access the Line of Credit funds during the Draw Period.

(g)  "Draw Period" means the period of time shown above during which you can receive advances under this Agreement.

(h) "Initial Advance" means the amount of money we will require you to accept as an advance to open the Account.

(i) "Line of Credit" means the home equity line of credit offered to Borrower by Lender pursuant to the terms of this Agreement.

(j) "Loan Account Balance" means the sum of the unpaid principal of advances made under your Line of Credit, plus unpaid but earned finance charges, plus any costs, expenses, and fees that are due.

(k) "Maturity Date" for Line of Credit is **December 15, 2021**. On this date, you promise to pay any remaining Loan Account Balance.

(l) "Minimum Advance" means the smallest amount of money we will advance to you under this Agreement.

(m) "Minimum Payment" means the minimum payment you must make on the Line of Credit, as reflected on each periodic billing statement Lender will deliver to you for each Billing Cycle.

(n) "Plan" refers to this Home Equity Line of Credit collectively.

(o) "Repayment Period" means the period of time shown above during which you must repay the outstanding balance of your Account, with accrued interest, but may not request further advances. The Repayment Period begins at the end of the Draw Period, and ends on the earlier of the Maturity Date or the date when final payment of the Loan Account Balance has actually been made.

This is a personal line of credit which we are making available to you to obtain loans up to the Credit Limit on the terms and conditions contained in this Agreement. You will be able to obtain such loans from time to time, and in such amounts that we may advance and re-advance to you up to the Credit Limit, subject to the terms of this Agreement.

**2.    PROMISE TO PAY; CREDIT LIMIT.** You promise to pay to Lender, or order, the total of all funds which are advanced and re-advanced to you from time to time under this Agreement, plus interest thereon, as set forth below. You also promise to pay Lender, or order, all other amounts, fees, costs and charges you are responsible for under this Agreement and that are permitted or not prohibited by applicable law. You must repay the entire outstanding Loan Account Balance, plus all accrued interest and any fees and charges due and payable on the Account, on or before the Maturity Date shown above. In the event all such sums are not paid on or before the Maturity Date, then interest shall continue to accrue on the Loan Account Balance using the same method of calculating your interest rate as set forth below.

Your Credit Limit is set forth at the beginning of this Agreement. You agree not to allow the principal amount that you owe on the Account to exceed the Credit Limit. If you do exceed the Credit Limit, you will repay the excess immediately.

**3.    SECURITY.** All amounts due under the Account are secured by a mortgage, deed of trust, or security deed (the "Security Instrument") on the Property. You agree to pay all amounts due from you, and otherwise perform all covenants and obligations required of you, under the Security Instrument. If it becomes necessary for us to advance funds to you beyond the Credit Limit to protect our security interest, those amounts in excess of the Credit Limit will be owed by you and will be secured by the Security Instrument. The Security Instrument and this Agreement are related documents and a default under one document will be treated as a default under the other document. To the extent permitted by applicable law, the lien of the Security Instrument will continue and will have the same priority of claim if, with your consent, we renew, extend, amend, modify or substitute this Agreement. In the event of such renewal, extension, modification or substitution, you agree to execute any additional documents necessary to accomplish the action being taken.

Property securing any other loans that you have with us may also secure this Agreement.

**4.    LOAN ADVANCES.** We are not obligated to advance any funds to you under this Agreement until: (a) the Security Instrument: (i) has been reviewed by us for accuracy and completeness, (ii) has been recorded in the appropriate land records of the jurisdiction in which the Property is located, and (iii) constitutes a valid lien on the Property, with no other encumbrances on the Property except for any prior mortgage or deed of trust and declarations, easements or restrictions of record listed in a schedule of exceptions to coverage in the title insurance policy insuring Lender's interest in the Property and to which Lender has agreed; and (b) any applicable right of rescission has expired without exercise of that right.

After these conditions have been satisfied, you may obtain advances on your Account by using the Credit Line Checks. You may only write Credit Line Checks during the Draw Period, and only for amounts equal to or greater than the Minimum Advance amount shown above, subject to your Credit Limit. If your request is for less than the Minimum Advance, we may, at our option, grant the request. However, granting the request does not mean we will be required to grant requests for less than the Minimum Advance in the future. We always have the option to deny any such request. During the Draw Period, you may draw upon your Account, within the Credit Limit, until it is terminated or unless additional advances are otherwise prohibited, as provided below. You have the right at any time to limit the maximum amount of indebtedness to be secured by the Security Instrument. We will not honor Credit Line Checks received by us following the expiration of the Draw Period, regardless of whether you issue such Credit Line Checks during the Draw Period. We are not required to honor any request for any transfer or draw that would cause your outstanding indebtedness to exceed your Credit Limit. If we do make the advance, it does not mean that your Line of Credit has been increased. We may require you to repay the amount over your Line of Credit at once.

In the event that the law in the state in which the Property is located places restrictions on the continuing priority of the Security Instrument, the Draw Period will end immediately upon our receipt of notice complying with state law that an event has taken place that will cause future draws not to be secured by the Security Instrument in the same priority as the recorded Security Instrument. Such instances may include: we have been notified by you that you have exercised your right under state law to stop further advances under this Agreement from being secured by the Security Instrument; or we have received notice conforming to applicable state law that a lien has been recorded against the Property that will take priority over the lien of any further draws under the Agreement. You will promptly return to us any checks or other methods of accessing your Account to request Advances in any such event.

We reserve the right to make Loan Advances to protect our rights under the Security Instrument, including but not limited to paying property taxes, homeowners insurance or flood insurance premiums, and reinstating a delinquency in any mortgage loan with priority over the Security Instrument.

**5.    VARIABLE RATE.** The interest rate is variable, and the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) and the periodic payment may change. The **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) includes interest only and not other costs.

**6.    INITIAL INTEREST RATE.** Until 1 month(s) after the funding date (the "Initial Rate Period"), the daily periodic rate of **FINANCE CHARGE** is    0.0295%, which corresponds to an **ANNUAL PERCENTAGE RATE** of **10.750%**. The periodic rate and corresponding **ANNUAL PERCENTAGE RATE** described above are the initial rates assessed under this Agreement, and are based on the Index and Margin (defined below) used for later rate adjustments. Ask us for the current Index value, Margin, discount, and **ANNUAL PERCENTAGE RATE**. After you open this Line of Credit, rate information will be provided on periodic billing statements that we send you.

**7.    SUBSEQUENT INTEREST RATE.** Beginning after the initial rate period, the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) will equal the value of an "Index" as of the last publication date of the Index preceding the start of the Billing Cycle plus a "Margin" of **two and one-half** percentage points (**2.500%**), rounded to the nearest one-eighth of one percentage point (0.125%). The "Index" is the rate published in The Wall Street Journal under the designation "Money Rates" and shown as "prime rate" or "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks," or substantially similar words.

The **ANNUAL PERCENTAGE RATE** may change on the first day of every month during the term of this Agreement ("Change Date") and the rate will be effective until the ensuing Change Date. The **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) will not change more than once each Billing Cycle. An increase in the Index will result in an increase in the **FINANCE CHARGE** and corresponding **ANNUAL PERCENTAGE RATE**, which may have the effect of increasing your Minimum Payment. A decrease in the Index will have the opposite effect of an increase. If the Index changes more frequently than the **ANNUAL PERCENTAGE RATE** is scheduled to change, we will always use the Index in effect on the day we adjust the **ANNUAL PERCENTAGE RATE** to determine the new **ANNUAL PERCENTAGE RATE**. In such a case, we will ignore any changes in the Index that occur between **ANNUAL PERCENTAGE RATE** adjustments.

Your maximum **ANNUAL PERCENTAGE RATE** will be **18.000** %. Except for this **18.000** % "cap," there is no limit on the amounts by which the **ANNUAL PERCENTAGE RATE** may increase or decrease on any Change Date or over the life of the Line of Credit.

If the Index becomes unavailable, we will select a new index (and, if necessary, a new margin) that will result in an **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) that is substantially similar to the rate in effect at the time the original Index became unavailable.

**8.    CALCULATION OF FINANCE CHARGES.** You agree to pay a periodic **FINANCE CHARGE** (which we will refer to as "interest") on your Account based on the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) derived in accordance with Sections 6 and 7. The **FINANCE CHARGE** begins to accrue on the day that your Account has been debited for each advance, and continues to so accrue until the day the outstanding Loan Account Balance is paid in full.

To determine the **FINANCE CHARGE** for a Billing Cycle, we apply a daily periodic rate of **FINANCE CHARGE** to the balance of your Loan Account Balance each day ("Daily Balance") during the Billing Cycle. To determine the daily periodic rate, we divide the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) in effect for the Billing Cycle by 365. To obtain the Daily Balance, we take the unpaid balance of your Account at the beginning of each day, add any new advances and other debits, except late charges, credit insurance premiums and returned check fees, and subtract payments or credits and unpaid finance charges. This results in your daily principal balance for each day in the Billing Cycle. We then determine the **FINANCE CHARGE** for each day by multiplying the Daily Balance for such day by the daily periodic rate. These daily finance charges are added together to obtain the total periodic **FINANCE CHARGE** for the period covered by the Billing Cycle.

**9.    ADDITIONAL FINANCE CHARGES:** You agree to pay us the following additional **FINANCE CHARGES:**

   *    See Fee Schedule

**10.    MONTHLY PAYMENTS.**
**(A.)  DRAW PERIOD.** Each month, we will send you a periodic statement applicable to your Account. You must pay us at least the Minimum Payment indicated on the periodic statement by the date indicated on the statement. If, however, the unpaid balance in your Account is less than the Minimum Payment, your Minimum Payment will be equal to the balance in your Account. The Minimum Payment will include (a) late charges and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument; (b) current **FINANCE CHARGES** and accrued but unpaid **FINANCE CHARGES** for prior Billing Cycles; (c) premiums for any optional credit life insurance you may decide to obtain through us; and (d) an amount equal to the amount by which your Loan Account Balance exceeds your Credit Limit. If, however, the unpaid balance in your Account is less than the Minimum Payment, your Minimum Payment will be equal to the balance in your Account.

You can pay off all or any part of what you owe at any time. However, so long as you owe any amount, you must continue to make the Minimum Payment. During the Draw Period the Minimum Payment will not reduce the principal outstanding on your Line of Credit.

**(B.)  REPAYMENT PERIOD.** During the Repayment Period, the Minimum Payment will be an amount equal to the accrued and unpaid finance charges, late charges and other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us and under the Security Instrument, plus **0.8333%** of the Loan Account Balance outstanding at the end of the Draw Period. During the Repayment Period, payment of the Minimum Payment only may not fully repay your Loan Account Balance. If paying the Minimum Payment will neither reduce nor fully repay your Loan Account Balance, you will then be required to pay the entire balance in a single balloon payment on the Maturity Date shown above. We are not obligated to refinance any portion of that indebtedness, but will consider your request to do so. You must be prepared to repay the full amount due upon the expiration of this Agreement. If you refinance this Account at maturity, you may have to pay some or all of the closing costs normally associated with a new loan even if you obtain financing from us.

**11.    APPLICATION OF PAYMENTS.** We will apply all payments which we receive from you in the following order: to pay (a) amounts due under the Security Instrument to secure the amounts advanced under your Account and to protect our security; (b) any escrow payments, if we require such payments under the Security Instrument; (c) any late charges; (d) any other fees and charges other than finance charges; (e) accrued and unpaid finance charges; and (f) any unpaid principal balance.

**12.    PREPAYMENT.** You may repay all or any part of your outstanding Loan Account Balance, at any time, without penalty. During the Draw Period, any amounts that you repay will subsequently be available to you for advances, subject to your Credit Limit and other limitations in this Agreement. However, so long as you owe any amount you must continue to make your periodic Minimum Payment. Even if the entire outstanding Loan Account Balance has been repaid, the Account will remain open for future advances during the Draw Period, until you or your agent instructs us in writing to close the Account. The Security Instrument will remain in effect for all such future advances under your Account.

**13.    ADDITIONAL REPAYMENT TERMS.** If you fail to make a payment, we may, but are not required to, advance money to you to make the payment. All of the terms of this Agreement would apply to such an advance.

You can pay off all or part of what you owe at any time. However, so long as you owe any amount you must continue to make your periodic Minimum Payment. Even if you pay more than the Minimum Payment, this does not affect your obligation to pay at least the Minimum Payment on subsequent payment due dates.

**14.    SET-OFF.** You agree that we may set-off any amount due and payable under the terms of this Agreement against your right to receive money from us, unless prohibited by applicable law. For example, our right of set-off does not apply to an Individual Retirement Account; other tax-deferred retirement accounts; or federal benefit, wage, salary and retirement payments held in an electronic transfer account (ETA). In addition, our right of set-off does not apply to an account or other obligation if your rights arise only in a representative capacity or if you can obtain credit under this Agreement by using a credit card.

Your right to receive money from us includes any deposit or share account balance you have with us; any money owed to you on an item presented to us or in our possession for collection or exchange; and any repurchase agreement or other non-deposit obligation. "Any amount due and payable under the terms of this Agreement" means the total amount which we are entitled to demand payment of under the terms of this Agreement at the time we set-off.

**15.   CHANGING THE TERMS OF THIS AGREEMENT.** Generally, we may not change any term of this Agreement. However, we may change a term in the following circumstances: (a) we may prohibit additional extensions of credit or reduce your credit limit during the period that the maximum **ANNUAL PERCENTAGE RATE** is reached; (b) we may make specified changes that you have specifically agreed to in writing; (c) we may make changes that unequivocally benefit you throughout the remainder of the Plan; (d) we may make insignificant changes to the terms of this Agreement; or (e) if this is a variable rate plan, we may change the Index and Margin if the original Index described in this Agreement is no longer available. Any new index will have a historical movement similar to the original Index, and, together with a new margin, will result in an interest rate substantially similar to the rate in effect at the time the original Index became unavailable.

If we are required to send notice of a change in terms, we will send the notice to your address listed in this Agreement.

**16.   ADDITIONAL CHARGES.** You agree to pay the following additional charges pursuant to your Line of Credit:

-   Late Fee. A late charge on any payment not paid within **10** days of the payment due date of **6.000%** of the payment. For Indiana second lien loans, the amount of this late fee is subject to change, as allowed by Ind. Code Ann. §24-4.5-1-106 and Ind. Code Ann. §24-4.5-3-203.5(6), so as to always be the maximum amount permitted by law;

-   Annual Membership Fee. An annual fee of **$75.00** for each twelve-month period during the Draw Period. This fee will be added to your Loan Account Balance on a yearly basis;

-   Returned Check Fee. A fee of **$25.00** for any check that you have issued in connection with this Plan that is returned dishonored;

-   Stop Payment Fee. A fee of **$0.00** for each Credit Line Check that you issue for which you order us to stop payment;

-   A Termination Fee of $750.00 will be charged if your Home Equity Line of Credit is closed and the Security Instrument is reconveyed within the first 12 months after the date of closing or $500.00 if reconveyed after the first 12 months but prior to the 37th month. This will be charged only if permitted by applicable law.

-   (Other) See Fee Schedule.

**17.   INSURANCE.** You must maintain on the Property a homeowner's policy of casualty and liability insurance and flood insurance, if applicable, in such amount(s) and for such period(s) of time as we may require. To open your Account, you must provide us with written proof, such as a current certificate of insurance, showing the required insurance coverage on the Property, as well as an endorsement of such policy in favor of us. In addition, the policy must require that your insurance company provide us with at least fifteen (15) days written notice of any change in insurance coverage or of cancellation of your policy. We may refuse to honor checks or to make other advances or transfers of funds under the Account until we receive satisfactory evidence with respect to these items. You may purchase insurance from anyone you want who is acceptable to us. The Security Instrument more fully describes your insurance obligations.

**NOTICE TO ILLINOIS, MISSOURI AND OREGON BORROWERS: Unless you provide us with evidence of the insurance coverage required by your agreement with us, we may purchase insurance at your expense to protect our interests in your collateral. This insurance may, but need not, protect your interests. The coverage that we purchase may not pay any claim that you make or any claim that is made against you in connection with the collateral. You may later cancel any insurance purchased by us, but only after providing us with evidence that you have obtained insurance as required by our agreement. If we purchase insurance for the collateral, you will be responsible for the costs of that insurance, including interest and any other charges we may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to your total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own.**

18.    **TERMINATION AND ACCELERATION. DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH YOU CAN EXERCISE THIS RIGHT.** You will be in default of this Agreement, and we can terminate your Account and require immediate payment of the entire outstanding Loan Account Balance, plus accrued interest and other charges if any of the following occur: (a) you engage in fraud or material misrepresentation in connection with any phase of this Line of Credit; (b) you fail to meet the repayment terms of this Agreement for any outstanding balance; or (c) your action or inaction adversely affects the Property, our security interest or any other right that we have in the Property, including, but not limited to: (i) failure to maintain required insurance on the Property; (ii) the sale, transfer, conveyance, or encumbrance of the Property in violation of the Security Instrument; (iii) failure to maintain the Property or use of the Property in a destructive or illegal manner; (iv) commission of waste; (v) failure to pay taxes on the Property or otherwise act or fail to act and thereby cause a lien to be filed against the Property that is senior to the lien of the Security Instrument; (vi) your death, if you are solely obligated under this Agreement, or if the death of one of several Borrowers under this Agreement causes our security to be adversely affected; (vii) the Property is taken through eminent domain; (viii) a judgment is filed against you and subjects you and the Property to action that adversely affects our interest; (ix) a prior lienholder forecloses on the Property and as a result, our interest is adversely affected; or (x) you move out of the dwelling and our security interest is thereby adversely affected.  The Security Instrument also describes how and under what conditions you may be required to make immediate payment of the entire outstanding Loan Account Balance, plus accrued interest and other charges you owe under this Agreement.  Some of those conditions are described as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

> If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.    **REMEDIES.**  Subject to applicable law, we may terminate your Line of Credit, require you to pay the entire outstanding Loan Account Balance in one payment, charge you a termination fee (if provided for in this Agreement), and charge you any other fees related to the collection of the amount owing if you are in default in any manner described above. Furthermore, to the extent permitted by applicable law, in that instance we may also take any other action short of termination, such as charging you a fee if you fail to maintain required property insurance and we purchase insurance.  If you fail to pay the Loan Account Balance after notice and demand thereof, and as required by applicable law, we may foreclose the Security Instrument and sell the Property.  We can elect to exercise or delay enforcement of any of our rights under this Agreement and/or the Security Instrument without losing any such rights.  If we elect not to exercise or enforce any of our rights, such election shall not be deemed a waiver of any of those rights.  If we elect to terminate this Plan and accelerate the amounts owing on your Account, we may use our right to set-off, unless prohibited by applicable law.

**20.    SUSPENSION OF CREDIT AND REDUCTION OF CREDIT LIMIT.** We may temporarily prohibit you from obtaining additional advances or reduce your Credit Limit during any period in which: (a) the value of the dwelling that secures this Line of Credit declines significantly below the dwelling's appraised value for purposes of this Plan; (b) we reasonably believe you will not be able to fulfill the repayment obligations because of a material change in your financial circumstances; (c) you are in default of any material obligation of this Agreement, or any agreement securing this Agreement; (d) a government action prevents us from imposing the Annual Percentage Rate provided for in this Agreement; (e) the priority of our security interest is adversely affected by a government action to the extent that the value of the security interest is less than 120% of the Line of Credit; (f) the Annual Percentage Rate corresponding to the daily periodic rate reaches the maximum rate allowed under this Agreement; or (g) we have been notified by a regulatory agency that continued advances constitute an unsafe and unsound business practice.

In the event that we suspend your right to additional advances or reduce your Line of Credit, we will send you notice of our decision to do so at the address listed in this Agreement. If we have based our decision to suspend or reduce your credit privileges on an assessment of your financial condition or performance under this Plan and you believe that your situation has changed, you must request that we re-evaluate your situation in order to reinstate your privileges.

**21.    FINANCIAL AND CREDIT INFORMATION.** You will promptly provide us with personal financial information, including a financial statement, if we should request it for the purpose of reviewing your Account or updating your credit file. We may request such information from time to time, whether or not we have reason to believe that there are any problems with your Account or with your creditworthiness. Any advances or transfers made under the Account are made in reliance upon the information that you provide us, which you represent and warrant to us is true and accurate as of the date such information is given. You authorize us to make or have made any credit inquiries we feel are necessary. You also authorize the person or agencies to whom we make these inquiries to supply us with the information we request.

**If the Property is located in California, you are hereby notified in accordance with California law that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.**

**22.    ATTORNEY FEES AND OTHER COLLECTION COSTS.** If you default on this Agreement, you agree to pay all our reasonable attorneys' fees (not in excess of 10% of the principal amount due plus accrued unpaid interest if the property is located in Arkansas or 15% of the unpaid debt if the property is located in Colorado, Kansas, Missouri, New York, Oklahoma or South Carolina), that we incur if this debt is referred for collection to an attorney other than a salaried employee of ours, together will all other costs of collecting the debt not prohibited by applicable law. If the property is located in New Hampshire and if a court finds that section 361-C:2 of the New Hampshire Revised Code applies, then in the event that you prevail in any action, suit or proceeding brought by us or in any action brought by you, reasonable attorney fees may be awarded to you; further, if you successfully assert a partial defense or set-off, recoupment or counterclaim to an action brought by us, a court may withhold from us the entire amount of such portion of its attorneys' fees as the court shall consider equitable. In New Jersey, you must pay our attorney fees under the following conditions: (a) they are paid to an attorney authorized to practice law in this state; (b) such attorney is not a partner, officer, director or employee, whether salaried or commissioned, of ours; and (c) the suit to collect must be actually filed by the attorney and subsequently decided in our favor, in which case the attorney's fees shall not exceed 15% of the first $500, 10% of the next $500, and 5% of any excess due and owing under this Agreement and further provided that we provide you with the appropriate notice of suit as required by applicable law.

**23.    GOVERNING LAW AND ENFORCEABILITY.** Federal law applies to certain aspects of this Agreement. This Agreement will be governed by the laws of the jurisdiction in which the Property is located, except to the extent federal law applies. If any part of this Agreement is determined to be invalid, then we may enforce the remainder of this Agreement as if the invalid provision did not exist. If the real property securing this Agreement is located in Maryland and this Agreement is secured by a mortgage that is junior in priority to another mortgage, Title 12, Subtitle 9 of the Commercial Law Article of Maryland statutes shall govern this Agreement. If a federal law allows the imposition of a higher **FINANCE CHARGE** or other fee or charge than is allowed by Maryland law, the federal law shall apply. If the real property securing this Agreement is located in Kansas, we agree that this Agreement is made subject to the Kansas Uniform Consumer Credit Code.

**24.    TERMINATION OF AGREEMENT.** Your Account will automatically terminate on the earlier of the Maturity Date shown above or on the date we give you notice of the termination as the result of an occurrence of a default (as described in Section 18). Upon termination of the Account, the entire Loan Account Balance then outstanding, with accrued interest and any fees and charges owing on the Account, will be due and payable in full on that date. You can terminate this Agreement by written notice of termination of this Agreement and a request for a discharge of the Security Instrument mailed or delivered to us at any time. Your notice of termination will be effective on the first business day after we receive it and the entire principal balance outstanding on your Account, plus interest accrued thereon, together with fees and charges owing on the Account, will be due and payable in full on that date.

**25.    JOINT AND SEVERAL LIABILITY; TERMINATION OF ACCOUNT.** If this Account is jointly held, each of you authorizes any other Borrower, on his or her request alone and without the consent or knowledge of the other(s), to cancel the Line of Credit, to request and receive advances of principal under your Line of Credit Account, to take any action or to give or receive any notice under this Agreement, and to take all other actions in connection with this Agreement. In addition, any notice given by us to one of you shall be effective as to all of you. In any event, each of you will be legally responsible for payment of the total amount of the Loan Account Balance and applicable charges, regardless of any divorce, legal separation or other legal proceedings.

**26.    NOTICES.** We will mail statements and notices to you at the address set forth above. You must notify us in writing of any change in your name, address, or place of employment. You may send written notices to us at the address set forth above or at such other address that we designate in writing.

**27.    REPRESENTATIONS AND WARRANTIES.** You represent and warrant to us that the information contained in the loan application, in each material respect, was true at the time the loan application was completed. You represent and warrant to us that the terms of any existing deed of trust, mortgage, or security deed on the Property permit us to enter into this Agreement and that the loans secured by such existing deed of trust, mortgage, or security deed are current in all material respects and are not in default.

**28.    TAX DEDUCTIBILITY.** You acknowledge that we (including our employees and representatives) do not make any representations or warranties to you about the tax consequences of you establishing or using this Line of Credit (including the deductibility of interest or fees), and we will not be liable if interest or fees are not deductible. You should consult a tax advisor regarding the deductibility of interest, charges, and fees under this Agreement.

**29.    TITLE INSURANCE AND MORTGAGE RECORDING TAX.** The cost of title insurance and the mortgage recording tax shall be based on the maximum amount of the Line of Credit available to you, whether advanced or not.

**30.    BILLING ERRORS.** Your rights and responsibilities with regard to billing errors are explained in the document under the heading "YOUR BILLING RIGHTS," which is attached to this Agreement.

**31.    LOAN CHARGES.** If the Account is subject to a law that sets maximum loan charges, and that law is finally interpreted so that the interest or other charges collected, or to be collected, in connection with the Account exceeds the permitted limits, then: (i) any such charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from you which exceeded permitted limits shall be refunded to you. We will refund the excess either by reducing the principal owed under the Account or by making a direct payment to you. If we apply the excess toward reducing the principal balance, the reduction will be treated as a partial prepayment.

**32.    ASSIGNS.** This Agreement shall be binding upon you and each of your heirs, executors, administrators, successors and assigns, subject to the limitations on selling, transferring or otherwise conveying the Property contained in this Agreement and the Security Instrument.

**33.    WAIVERS.** To the extent not prohibited by law and subject to any required notice and opportunity to cure a default for failure to make a required payment, you waive protest, presentment for payment, demand, notice of dishonor, notice of acceleration, notice of intent to accelerate, and notice of nonpayment.

**34.    TERMINATION FEE.** To the extent permitted by applicable law, you will be charged a Termination Fee if this Line of Credit is closed and reconveyed within the first 36 months after the Account is established.

35.   **NOTICE TO MISSOURI BORROWERS ONLY.** Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect you (borrower(s)) and us (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

36.   **VIRGINIA HOMESTEAD WAIVER.** I (or we) waive the benefit of my (or our) exemption as to this obligation.

37.   **MARYLAND RECORDATION TAX.** If the security instrument securing this Agreement is subject to the recordation tax under Title 12 of Maryland statutes, you may, at your option, pay the recordation tax on your entire Line of Credit amount at closing, or you may pay the required tax on the amount of each advance at the time you obtain each advance. If you elect to pay the recordation tax as advances are made to you, you will have seven days from the date of the advance to file with the clerk of the court where the security instrument is recorded a verified statement of the amount of the advance. You will be responsible for paying the clerk the amount of the applicable recordation tax at that time as well as any other fees the clerk may impose. If you fail to do so, you may be penalized as provided in section 14-1012 of the Tax-Property Article of the Maryland statutes.

By executing this Agreement, you acknowledge that you have read this Agreement and that you agree to its terms and conditions. You also acknowledge that each person owning an interest in the Property has received a copy of this Agreement and two copies of the Notice of Right to Cancel, if applicable.

**NOTICE TO NEW JERSEY SECONDARY MORTGAGE LOAN BORROWERS: READ THIS PROMISSORY NOTE BEFORE YOU SIGN. DO NOT SIGN THIS PROMISSORY NOTE IF IT CONTAINS BLANK SPACES. THIS PROMISSORY NOTE IS SECURED BY A SECONDARY MORTGAGE LOAN ON YOUR REAL PROPERTY.**

**NOTICE TO OREGON BORROWERS: DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT. THIS AGREEMENT PROVIDES FOR THE PAYMENT OF A PENALTY IF YOU WISH TO REPAY THE LOAN PRIOR TO THE DATE PROVIDED FOR REPAYMENT IN THIS AGREEMENT.**

**NOTICE TO IOWA BORROWERS: IMPORTANT: READ BEFORE SIGNING. THE TEMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORECEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORECED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

| | | |
|---|---|---|
| _Sara Knowles_ (Borrower) | | _James N. Knowles_ (Borrower) |
| Sara Knowles | | James N Knowles |
| _____ (Borrower) | | _____ (Borrower) |
| _____ (Borrower) | | _____ (Borrower) |
| _____ (Borrower) | | _____ (Borrower) |

Lender:  **GreenPoint Mortgage Funding, Inc.**

By:  _____

**Jeff Bambrook**
Title:  **Senior Vice President**

## OUR BILLING RIGHTS
## KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

*Notify Us In Case of Errors or Questions About Your Bill*

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information:

- Your name and account number.

- The dollar amount of the suspected error.

- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings, checking, share draft or other account, you can stop the payment on any amount you think is wrong. To stop payment your letter must reach us three business days before the automatic payment is scheduled to occur.

### *Your Rights and Our Responsibilities*
After We Receive Your Written Notice

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any mistaken amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. We must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

# Fee Schedule

| ADDITIONAL FINANCE CHARGES | | ADDITIONAL OTHER CHARGES | |
|---|---|---|---|
| Description | Amount | Description | Amount |
| Funding Fee to GPM | $150.00 | Title Insurance | $380.00 |
| | | Recording Fees | $100.00 |

| | |
|---|---|
| In addition to the **Finance Charges** listed above, any additional **Finance Charges** listed on the HUD-1 settlement statement executed by you and of even date herewith, is hereby incorporated herein by reference and made a part hereof. | In addition to the Other Charges listed above, any additional Other Charges listed on the HUD-1 settlement statement executed by you and of even date herewith, is hereby incorporated herein by reference and made a part hereof. |

**GreenPoint Mortgage Funding, Inc. will be paying the Broker for services provided in this transaction in the amount of $ 170.63**

0091305938
11/20/2006
668_HS-PPAQ I.O. 1MO/1MO TEASER

# HOME EQUITY LINE OF CREDIT DISCLOSURE

**1. RETENTION OF INFORMATION.** This Disclosure contains important information regarding your Home Equity Line of Credit. You should read it carefully and retain a copy for your records.

**2. CONDITIONS FOR DISCLOSED TERMS.** All of the terms described below are subject to change prior to the opening of your Home Equity Line of Credit. If a disclosed term changes (other than the annual percentage rate) prior to the opening of your Home Equity Line of Credit, and you therefore elect not to enter into an agreement with us, you may receive a refund of all fees paid in connection with your application.

**3. SECURITY INTEREST AND RISK TO HOME.** We will acquire a security interest in your home. You could lose your home in the event you fail to meet the obligations contained in your agreement with us.

**4. POSSIBLE ACTIONS.** Under certain conditions, we may (a) terminate your Home Equity Line of Credit and require immediate payment in full of the entire outstanding balance in a single payment, as well as require certain fees to be paid that result from the termination; (b) prohibit additional extensions of credit or reduce your credit limit; and/or (c) as further detailed in your agreement with us, implement certain changes in your Home Equity Line of Credit.

We can terminate your Home Equity Line of Credit and require immediate payment in full of the entire outstanding balance in a single payment, as well as require certain fees to be paid that result from the termination if any of the following occur: (a) you engage in fraud or material misrepresentation in connection with any phase of your Home Equity Line of Credit; (b) you fail to meet the repayment terms of your agreement with us for any outstanding balance; or (c) your action or inaction adversely affects the property securing your Home Equity Line of Credit, our security interest or any other right that we have in such property.

We can prohibit additional extensions of credit or reduce your credit line during any period in which: (a) the value of the dwelling that secures your Home Equity Line of Credit declines significantly below the dwelling's appraised value for the purposes of your Home Equity Line of Credit; (b) we reasonably believe you will not be able to fulfill the repayment obligations because of a material change in your financial circumstances; (c) you are in default of any material obligation contained in your agreement with us; (d) a government action prevents us from imposing the annual percentage rate provided in your agreement with us; (e) the priority of our security interest is adversely affected by a government action to the extent that the value of the security interest is less than 120% of your Home Equity Line of Credit; (f) the annual percentage rate corresponding to a daily periodic rate reaches the maximum rate allowed under your agreement with us; or (g) we have been notified by a regulatory agency that continued advances constitute unsafe and unsound business practice.

**5. PAYMENT TERMS.** You can obtain credit advances for 5 years. This is known as the "draw period". Payments during the draw period, except for the first payment, will be due monthly. The minimum monthly payment will include (a) the accrued finance charges as of the last day of the billing cycle; (b) any late charges and other charges authorized by your agreement with us; (c) premiums for any optional credit life insurance you decide to obtain through us; and (d) an amount equal to the amount by which your outstanding balance exceeds your credit limit.

Your first payment will be determined in the same manner described above and will normally be due 15 days after the date of your first periodic statement. Your first periodic statement is normally generated and mailed no later than 15 days prior to the date your first installment is due.

Upon the expiration of the draw period, you may not request further advances and must pay the outstanding balance on your Home Equity Line of Credit, with accrued interest, over a period of 10 years. This is known as the "repayment period".

During the repayment period, payments will be due monthly. Your minimum monthly payment will equal the amount of accrued interest plus 0.8333% of the principal loan account balance at the end of the draw period.

If you made only the minimum monthly payment and took no other credit advances, it would take you 15 years to pay off a $10,000.00 outstanding balance at an annual percentage rate of 10.00%. During that time, you would make 60 payments of $83.33 followed by 119 payments varying between $166.66 and $84.72, with a final payment of $84.03.

**6. FEES AND CHARGES IMPOSED BY US.** You must pay the following fees to use and maintain your Home Equity Line of Credit:

**Funding Fee to GPM\***                                    $150.00

    - An Annual Maintenance Fee of $75.00 due each year.
    **A Termination Fee of $750.00 will be charged if your Home Equity Line of Credit is closed and the Security Instrument is reconveyed within the first 12 months after the date of closing or $500.00 if reconveyed after the first 12 months but prior to the 37th month.  This will be charged only if permitted by applicable law.**

**7. FEES AND CHARGES IMPOSED BY THIRD PARTIES. You must also pay certain fees that may be imposed by persons other than us in order to open your Home Equity Line of Credit.  These fees generally total between $750.00 and $7,500.00.  Upon your request, you may receive a good faith estimate itemization of such fees.**

**NEW YORK LOANS ONLY:** The mortgage recording tax and title insurance fee shall be based on the maximum amount of the credit line available to you, whether advanced or not.

You must carry insurance on the property that secures your Home Equity Line of Credit.

If a financial institution mortgagee on the property is not escrowing for taxes or insurance, we reserve the right to require your to make an initial escrow deposit and make monthly escrow payments to us.  The amount of the initial deposit and monthly payments will vary depending on the amount of taxes and insurance premium payable.

Refundability of Fees.  If you decide not to enter an agreement with us within three days of receiving this disclosure and the Federal Reserve's Home Equity brochure, you are entitled to a refund of any fee you may have already paid.

**For Broker Application Only:** We will pay your broker for services provided in an amount estimated to be $170.63 .

**8. TRANSACTION REQUIREMENTS.  The minimum advance we will advance to you at any one time under your Home Equity Line of Credit is $100.00.**

**9. TAX IMPLICATIONS.** You should consult a tax advisor regarding the deductibility of interest and other charges under your Home Equity Line of Credit.

**10. VARIABLE RATE INFORMATION.**

(A)  This Home Equity Line of Credit has an interest rate that is variable, which means that the annual percentage rate (corresponding to a daily periodic rate) and the periodic payment may change as a result.

(B)  The annual percentage rate does not include costs other than interest.

(C)  The annual percentage rate corresponds to the value of an "Index." The Index is the rate published in <u>The Wall Street Journal</u> under the designation "Money Rates" and shown as "Prime Rate" or "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks," or substantially similar words.

(D)  Your annual percentage rate is based on the Index plus a margin.

(E)  You should ask us about the current Index value, the margin, any discount or premium, and the annual percentage rate.

(F)  The initial interest rate is not based on the Index and margin used to make later adjustments to your interest rate. The initial rate will be in effect for **1** month(s).

(G)  After the initial interest rate period is no longer in effect, the annual percentage rate may change monthly. Your maximum annual percentage rate will be **18.000** %. Except for this "cap," there is no limit on the amounts by which the annual percentage rate may increase or decrease in any one month, any one year period or over the life of the Home Equity Line of Credit.

(H)  If you had an outstanding balance of $10,000.00 at the beginning of the draw period, the minimum monthly payment at the maximum annual percentage rate **18.000%** would be **$150.00**. The maximum annual percentage rate during the draw period could be reached the first month after the initial interest rate period is no longer in effect.

If you had an outstanding balance of $10,000.00 at the time your Home Equity Line of Credit enters the repayment period, the minimum monthly payment at the maximum annual percentage rate of **18.000%** would be **$233.33**. The maximum annual percentage rate could be reached on the day your Home Equity Line of Credit enters the repayment period.

(I)  The following table illustrates how the annual percentage rate and the minimum payments for a single $10,000.00 advance would have been affected by changes in the Index over the past 15 years. The Index values are from the first business day of June of each year. While only one payment amount is shown per year, payments would have varied throughout the year. The table assumes that no additional credit advances were taken, that only the minimum payments were made each month, and that the rate remained constant during each year. The table does not necessarily reflect how the Index or your minimum payments may change in the future.

|  | Year | Index (%) | Margin*(%) | Annual Percentage Rate (%) | Minimum Monthly Payments ($) |
|---|---|---|---|---|---|
| Draw Period | 1992 | 6.500 | 2.000 | 7.500** | 62.50 |
|  | 1993 | 6.000 | 2.000 | 8.000 | 66.67 |
|  | 1994 | 7.250 | 2.000 | 9.250 | 77.08 |
|  | 1995 | 9.000 | 2.000 | 11.000 | 91.67 |
|  | 1996 | 8.250 | 2.000 | 10.250 | 85.42 |
| Repayment Period | 1997 | 8.500 | 2.000 | 10.500 | 170.83 |
|  | 1998 | 8.500 | 2.000 | 10.500 | 170.83 |
|  | 1999 | 7.750 | 2.000 | 9.750 | 164.58 |
|  | 2000 | 9.500 | 2.000 | 11.500 | 179.16 |
|  | 2001 | 6.750 | 2.000 | 8.750 | 156.25 |
|  | 2002 | 4.750 | 2.000 | 6.750 | 139.58 |
|  | 2003 | 4.000 | 2.000 | 6.000 | 133.33 |
|  | 2004 | 4.250 | 2.000 | 6.250 | 135.41 |
|  | 2005 | 6.000 | 2.000 | 8.000 | 150.00 |
|  | 2006 | 8.000 | 2.000 | 10.000 | 166.66 |

\*  This is a margin we have used recently for our Home Equity Lines of Credit; your margin may differ.
\*\* This is a 1% discount that we have used recently; your loan may have a different discount amount.

(J)  Detailed rate information for your Home Equity Line of Credit will be provided on or with each periodic statement.

**NEW YORK LOANS ONLY: PRIOR LIENS: YOU SHOULD CHECK WITH YOUR LEGAL ADVISOR AND WITH OTHER MORTGAGE LIEN HOLDERS AS TO WHETHER ANY PRIOR LIENS CONTAIN ACCELERATION CLAUSES WHICH WOULD BE ACTIVATED BY A JUNIOR ENCUMRANCE.**

**NEW YORK LOANS ONLY: CREDIT REPORT:** A consumer credit report will be obtained in connection with this application. The name and address of the agency providing credit reports will be furnished upon request. A consumer credit report may also be requested in connection with any update, renewal or extension of the credit for which application is made.

## ACKNOWLEDGMENT

By signing below, you acknowledge receipt of this Home Equity Line of Credit Disclosure, as well as receipt of a copy of the Home Equity Brochure.

| | (Borrower) | | | | (Borrower) | |
|---|---|---|---|---|---|---|
| SARA KNOWLES | | (Date) | JAMES KNOWLES | | | (Date) |
| | (Borrower) | | | | (Borrower) | |
| | | (Date) | | | | (Date) |
| | (Borrower) | | | | (Borrower) | |
| | | (Date) | | | | (Date) |
| | (Borrower) | | | | (Borrower) | |
| | | (Date) | | | | (Date) |

**EXHIBIT "4"**

After recording please return to:

**GreenPoint Mortgage Funding, Inc.**
**981 Airway Court, Suite E**
**Santa Rosa, CA 95403-2049**
[Company Name & Address]

This instrument was prepared by:

**GreenPoint Mortgage Funding, Inc.**
**100 Wood Hollow Drive, Novato, CA 94945**

[Company Name & Address]

**(800) 462-2700**
[Telephone No.]

(Check if applicable)  [X]  This Deed of Trust secures a purchase money loan.

Assessor's property tax parcel or account number: **5825-008-005**

---

**OPEN-END DEED OF TRUST**    MIN # **100013800913059388**

Line of Credit Trust Deed

**THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST. DEFAULT ON PAYMENTS MAY RESULT IN THE LOSS OF YOUR HOME. THIS INSTRUMENT SECURES AN OBLIGATION THAT MAY INCREASE AND DECREASE FROM TIME TO TIME.**

---

HELOC Deed of Trust California            **HELOCDOT 02/2006**
GreenPoint Mortgage Funding, Inc.        Page 1 of 12

This Open-Ended Deed of Trust ("Deed of Trust") is effective as of **December 4, 2006**, between **James N Knowles and Sara Knowles, Husband And Wife  as joint tenants.** ("Borrowers"), whose address is , **372 Laun, Altadena, CA 91001, Marin Conveyancing Corp.** ("Trustee"), whose business address is **981 Airway Court, Santa Rosa, CA 95403** ("Trustee Address"), and **Mortgage Electronic Registration System, Inc.**, a Delaware corporation whose address is P.O. Box 2026, Flint, MI 48501-2026, as nominee for **GreenPoint Mortgage Funding, Inc.** whose address is **100 Wood Hollow Drive, Novato, CA 94945** and/or its successors and assigns ("Lender").

WITNESSETH:

This Deed of Trust secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Home Equity Line of Credit Agreement of even date herewith ("HELOC Agreement") under which the Borrowers may request loan advances from time to time, the maximum outstanding principal amount of which is $45,500.00; and (ii) the performance of Borrowers' covenants and agreements under this Deed of Trust and the HELOC Agreement. For this purpose, Borrowers irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in **Los Angeles County** of California [state], and described as:

   **As more particularly described in exhibit "A" attached hereto and made a part hereof.**

which currently has the address of **2020 Newport Ave., Pasadena, CA  91103** ("Property Address"). If the Property is located in Nevada, this Deed of Trust is subject to Nevada Rev. Stat. 106.300 to 106.400 and secures future advances. If the Property is located in Virginia: **THIS IS A CREDIT LINE DEED OF TRUST.**

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Deed of Trust. All of the foregoing is referred to in this Deed of Trust as the "Property."

Borrowers covenant that Borrowers are lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrowers warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

The maximum amount of indebtedness that may be outstanding at any time is **$45,500.00**. The amount of indebtedness outstanding at any time may fluctuate. The HELOC Agreement provides for a variable interest rate that may change from time to time based on changes in an index. The entire indebtedness under the Agreement, if not paid earlier, is due and payable on **December 15, 2021**, or at such earlier date in the event such indebtedness is accelerated in accordance with the terms of the Agreement and/or this Security Instrument.

Tennessee derivation clause:

Derivation Clause

The instrument constituting the source of the Borrower's interest in the foregoing described property was a ☐ Warranty Deed  ☐ Quitclaim Deed  ☐ Other_____ recorded ☐ at Book _____, Page _____ under Instrument No. _____ in the Register's Office of  County, Tennessee.

BORROWERS' COVENANTS:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the HELOC Agreement and any prepayment charges and late charges due under the HELOC Agreement. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the HELOC Agreement and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the HELOC Agreement or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the HELOC Agreement and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer. Payments are deemed received by Lender when received at the location designated in the HELOC Agreement or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the HELOC Agreement immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the HELOC Agreement and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the HELOC Agreement; (b) principal due under the HELOC Agreement; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the HELOC Agreement. If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the HELOC Agreement. Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the HELOC Agreement shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the HELOC Agreement, until the HELOC Agreement is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time

during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3. Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA. If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments. Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3. Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4. Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan,

either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might· affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower. If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the HELOC Agreement rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the HELOC Agreement up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the HELOC Agreement up to the amount of the outstanding loan balance. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2. If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the Insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the HELOC Agreement or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the HELOC Agreement or this Security Instrument, whether or not then due.

### WARNING

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by applicable law.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration. Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the HELOC Agreement rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the

Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the mortgage insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a nonrefundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a nonrefundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the HELOC Agreement. Mortgage Insurance reimburses Lender (or any entity that purchases the HELOC Agreement) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance. Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums). As a result of these agreements, Lender, any purchaser of the HELOC Agreement, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further: **(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund. (b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

    **11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender. If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2. In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess,

if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2. In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower. In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due. If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds. Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the HELOC Agreement (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the HELOC Agreement without the co-signer's consent. Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys's fees, property inspection, statement of obligation or payoff statement fees, and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law. If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any

sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the HELOC Agreement or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the HELOC Agreement). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the HELOC Agreement conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the HELOC Agreement which can be given effect without the conflicting provision. As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the HELOC Agreement and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** NOTICE: THE DEBT SECUREED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at anytime prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b)such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgement enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the HELOC Agreement as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this

Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of HELOC Agreement; Change of Loan Servicer; Notice of Grievance.** The HELOC Agreement or a partial interest in the HELOC Agreement (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the HELOC Agreement and this Security Instrument and performs other mortgage loan servicing obligations under the HELOC Agreement, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the HELOC Agreement. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the HELOC Agreement is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the HELOC Agreement, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the HELOC Agreement purchaser unless otherwise provided by the HELOC Agreement purchaser. Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products). Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to**

HELOC Deed of Trust California                                    HELOCDOT 02/2006
GreenPoint Mortgage Funding, Inc.              Page 10 of 12

Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale. Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all HELOC Agreements evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Senior Lien.** In the event that there is a lien senior to the lien of this Security Instrument, Borrower agrees to fully discharge such lien according to its terms. In the event that the holder of the lien commences proceedings to foreclose the lien in preparation for selling the Property to satisfy the lien, Lender may take action to reinstate or, at Lender's option, repay the lien in full and obtain a full release or an assignment of the lien from the lienholder. Any amounts so expended by Lender shall be secured by the lien of this Security Instrument. Any default of Borrowers in discharging their obligations to the senior lienholder shall be a default under this Security Instrument giving Lender the rights set forth in Section 22 and elsewhere in this Security Instrument.

**26. Request for Notice of Default.** Lender requests that it be provided notice of any event of default with respect to any senior lien on the Property and that such notice be sent to Lender at the following address: GreenPoint Mortgage Funding, Inc., 2300 Brookstone Centre Parkway, Columbus, GA 31904.

**27. Riders to this Security Instrument.** Means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Revocable Trust Rider | ☐ Interim Interest Rider |
| ☐ Other(s) [specify] | | ☐ Occupancy Rider |

IN WITNESS WHEREOF, this Deed of Trust has been signed and sealed by Borrowers as of the date first above written.

Witnesses:

Borrowers:

_Sara Knowles_
**Sara Knowles**

_James N. Knowle_
**James N Knowles**

State of ____CA____

County of ____Los Angeles____

On ____12/10/06____ _____ before me,
____Dany Victory____ notary public, personally appeared **Sara Knowles,**

**James N Knowles**

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon the behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

Notary Public

My Commission Expires: ____8/25/07____

DANY VICTORY
COMM. #1432647
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Aug. 25, 2007

**HELOC Deed of Trust California**
GreenPoint Mortgage Funding, Inc.          Page 12 of 12          **HELOCDOT 02/2006**

0091305938

# NAME AFFIDAVIT

Words used in this Affidavit are defined below.  Words in the singular mean and include the plural and vice versa.

"Borrower" is  **Sara Knowles**

"Lender" is  **GreenPoint Mortgage Funding, Inc.**

, and its successors or assigns.

"Loan" means the debt evidenced by the Note and all sums due under the Security Instrument.
"Note" means the promissory note(s) dated  December 4, 2006                          , signed by
Borrower in favor of Lender.
"Security Instrument" means the Deed of Trust/Mortgage/Security Deed/Security Instrument signed by Borrower
in favor of Lender, securing payment of the Note.

BEFORE ME, the undersigned authority duly authorized to take acknowledgements and administer oaths, on
this day personally appeared Borrower, who upon being duly sworn on oath stated the following:

1.    I am the same person named in the Note and the Security Instrument.
2.    I solemnly swear before a Notary Public that I am one and the same person as:
      **No additional names found.**

3.    I also swear and affirm that the signature below is my true and exact signature for execution of the Loan
      documentation.
4.    I understand that this Affidavit is given as a material inducement to cause Lender to make the Loan to me
      and that any false statements, misrepresentations or material omissions may result in civil and criminal
      penalties.

**Sara Knowles**                                          (Borrower)

Subscribed and sworn to before me on  12/7/06

Notary Public in and for the State of  CA
My Commission Expires:  8/25/07

DANY VICTORY
COMM. #1432647
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Aug. 25, 2007

Name Affidavit (Multistate)                                                                      06308MU (2/06)
GreenPoint Mortgage Funding, Inc.                        Pages 1 of 1

0091305938

# NAME AFFIDAVIT

Words used in this Affidavit are defined below.  Words in the singular mean and include the plural and vice versa.

"Borrower" is   **James N Knowles**

"Lender" is      **GreenPoint Mortgage Funding, Inc.**

, and its successors or assigns.
"Loan" means the debt evidenced by the Note and all sums due under the Security Instrument.
"Note" means the promissory note(s) dated  December 4, 2006                                    , signed by Borrower in favor of Lender.
"Security Instrument" means the Deed of Trust/Mortgage/Security Deed/Security Instrument signed by Borrower in favor of Lender, securing payment of the Note.

BEFORE ME, the undersigned authority duly authorized to take acknowledgements and administer oaths, on this day personally appeared Borrower, who upon being duly sworn on oath stated the following:
1. I am the same person named in the Note and the Security Instrument.
2. I solemnly swear before a Notary Public that I am one and the same person as:
   **James Knowles**

3. I also swear and affirm that the signature below is my true and exact signature for execution of the Loan documentation.
4. I understand that this Affidavit is given as a material inducement to cause Lender to make the Loan to me and that any false statements, misrepresentations or material omissions may result in civil and criminal penalties.

_James N. Knowles_

**James N Knowles**                                    (Borrower)

Subscribed and sworn to before me on

12/10/06

Notary Public in and for the State of  CA
My Commission Expires:  8/25/07

DANY VICTORY
COMM. #1432647
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Aug. 25, 2007

Name Affidavit (Multistate)                                                                                          06308MU (2/06)
GreenPoint Mortgage Funding, Inc.                           Pages 1 of 1