| Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number | FOR COURT USE ONLY |
|---|---|
| Michael A. Cisneros, Attorney at Law    SBN 105483<br>50 West Lemon Avenue<br>Suite 12<br>Monrovia, CA  91016<br>Tel. No.  (626) 359-3692<br>Fax No.  (626) 359-3728<br><br>*Attorney for* Debtors, James 7 Sara Knowles | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA

| In re:<br><br>JAMES N. KNOWLES and SARA KNOWLES<br><br><br><br>Debtor. | CHAPTER 11<br><br>CASE NUMBER 2:10-bk-11762ER<br><br>DATE: 7/22/10<br>TIME: 10:00 am<br>COURTROOM: 1568 |
|---|---|

## NOTICE OF MOTION FOR:

> Order Authorizing Sale of Real Property located at 1224 Corson Street, Pasadena, CA  91106 Free and Clear of Liens

*(Specify name of Motion)*

1.  TO: GMAC Mortgage, LLC; BAC Home Loans Servicing, LP and All Other Parties in Interest

2.  NOTICE IS HEREBY GIVEN that on the following date and time and in the indicated courtroom, Movant in the above-captioned matter will move this Court for an Order granting the relief sought as set forth in the Motion and accompanying supporting documents served and filed herewith.  Said Motion is based upon the grounds set forth in the attached Motion and accompanying documents.

3.  **Your rights may be affected.**  You should read these papers carefully and discuss them with your attorney, if you have one.  (If you do not have an attorney, you may wish to consult one.)

| **Hearing Date**: 7/22/10 | **Time**: 10:00 am | **Courtroom**: 1568 | **Floor**:  15 |
|---|---|---|---|
| ☒  **255 East Temple Street, Los Angeles** | | ☐  **411 West Fourth Street, Santa Ana** | |
| ☐  **21041 Burbank Boulevard, Woodland Hills** | | ☐  **1415 State Street, Santa Barbara** | |
| ☐  **3420 Twelfth Street, Riverside** | | | |

4.  **Deadline for Opposition Papers:** This Motion is being heard on regular notice pursuant to Local Bankruptcy Rule 9013-1. If you wish to oppose this Motion, you must file a written response with the Bankruptcy Court and serve a copy of it upon the Movant or Movant's attorney at the address set forth above no less than fourteen (14) days prior to the above hearing date.  If you fail to file a written response to this Motion within such time period, the Court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

5.  **Hearing Date Obtained Pursuant to Judge's Self-Calendaring Procedure:** The undersigned hereby verifies that the above hearing date and time were available for this type of Motion according to the Judge's self-calendaring procedures.

Dated: 7/5/10

Michael A. Cisneros, Attorney at law
*Law Firm Name*

By: _____

Name:  Michael Anthony Cisneros
*Attorney for Movant*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1 | **MICHAEL A. CISNEROS**
ATTORNEY AT LAW
2 | 50 WEST LEMON AVENUE
SUITE 12
3 | **MONROVIA, CALIFORNIA 91016**
(626) 359-3692 FAX: (626) 359-3728
**Michael A. Cisneros, SBN 105483**
4 | mcisneros@mac.com

5 | Attorneys for Debtors, James N. & Sara Knowles

6

7

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10

11 | In re: | **Chapter 11**

12 | JAMES N. KOWLES and SARA KNOWLES, | **CASE NO. 2:10-bk-11762ER**

13 | | **MOTION OF DEBTORS, JAMES N. KNOWLES AND SARA KNOWLES, FOR ORDER AUTHORIZING SALE OF REAL PROPERTY LOCATED AT 1224 CORSON STREET, PASADENA, CA, FREE AND CLEAR OF LIENS; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF JAMES N. KNOWLES IN SUPPORT THEREOF**

14 | Debtors

15

16

17

18

19 | **Date:** **July 22, 2010**
**Time:** **10:00 a.m.**
**Place:** **Courtroom "1568"**

20

21 | TO GMAC MORTGAGE, LLC, BAC HOME LOANS SERVICING LP AND ALL OTHER

22 | PARTIES IN INTEREST:

23 | Debtors, James N. Knowles and Sara Knowles, hereby move this Court for an Order

24 | Authorizing the Sale of the Real Property Located at 1224 Corson Street, Pasadena, CA ("Real

25 | Property") Free and Clear of Liens, which property is income property improved by a four unit

26 | residential apartment building.

27 | ///

28 | ///

1

1      The Debtors seek the requested Order on the grounds that the proposed sale of the Real

2  Property will benefit both the estate and creditors, that the price is fair and reasonable and is the

3  highest bid the Debtors could obtain, and that the sale is made in good faith.  The request of the

4  Debtors is made pursuant to the provisions of 11 U.S.C. §363(b)(1) and Bankruptcy Rule 6004,

5  which allows the Court to authorize a sale of property of the estate, free and clear of liens, under

6  certain circumstances.  The Debtors have negotiate a sale of the Real Property for $680,000.00, the

7  proceeds of which will pay a Broker's Commission for representing the Debtors and finding the

8  buyer of the Real Property with the balance to pay the secured portion of the senior lienor's

9  obligation secured by the Real Property.

10     Pursuant to Local bankruptcy Rule 6004-1, the Debtors make the following disclosures:

11  1.    The hearing on the proposed sale will be held on July 22, 2010 at 10:00 a.m. in

12        Courtroom 1568, of United States bankruptcy Court, Central District of California,

13        255 East Temple Street, 15th Floor, Los Angeles, CA  90012;

14  2.    The Buyers are Joe C. Teo and Thuy T. Tran and their address is 6139 Temple City

15        Blvd., Temple City, CA  91780;

16  3.    The property to be sold is a four unit apartment building located at 1224 Corson

17        Street, Pasadena, CA;

18  4.    The sales price for the Real Property is $680,000.00, all cash with no financing

19        contingencies;

20  5.    The proposed sale is free and clear of liens, claims and interests.  The two liens

21        encumbering the Real property are recorded in favor of GMAC Mortgage, LLC and

22        BAC Home Loans Servicing, LP. The liens will attach to the sale proceeds;

23  6.    The proposed sale is not subject to higher and better bids because the Debtors believe

24        that the Buyers' bid constitutes the highest bid; however, in order to ensure that the

25        Buyers' bid is the highest bid, a copy of this Motion will be served on all potential

26        buyers who had previously shown interest in purchasing the Real Property.

27  7.    Based on current estimates, Debtors estimate that the sale proceeds will be distributed

28        as follows:

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692  FAX: (626) 359-3728

2

| | | |
|---|---|---|
| 1 | Sales Price: | $680,000.00 |
| 2 | Less: | |
| 3 |     Estimated Property Taxes: | 00.00 |
| 4 |     Commission: | $40,800.00 |
| 5 |     Estimated Costs of Sale: | $5,000.00 |
| 6 |     Subtotal: | $634,200.00 |
| 7 | Payable to GMAC Mortgage: | $634,200.00 |
| 8 | Payable to BAC Home Loans | 0.00 |

9     The Debtors hereby seek authorization to pay real estate brokers, Keller Williams Realty and

10 Coldwell Banker Dynasty, a commission of $40,800.00 (6.00% of the sales price).

11     The sale will not generate a capital gains tax for the Debtors as the sale is for an amount less

12 than what the Debtors' purchased the Real Property.

13     The relief requested by this Motion is based upon the attached Notice of Motion and Motion,

14 the Declaration of James N. Knowles, the Memorandum of Points and Authorities attached hereto, all

15 pleadings and documents currently on file with the Court as well as such other oral or documentary

16 evidence as may be presented to the Court at the time of hearing on this Motion.

17 Date: July 5, 2010

                                **MICHAEL A. CISNEROS**
                                **Attorney at Law**

                                By: _____
                                  **Michael Anthony Cisneros**
                                  Attorneys for Debtors
                                  James N. Knowles and Sara Knowles

18

19

20

21

22

23

24

25

26

27

28

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 1016
(626) 359-3892 FAX: (626) 359-3728

Motion to Sell Real Property, etc. (Corson)

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I**

3  **Introduction**

4      James N. Knowles and Sara Knowles ("Debtors") request authority from the Bankruptcy

5  Court to sell the estate's interest in certain real property located at 1224 Corson Street, Pasadena, CA

6  ("Real Property") for $680,000.00, which is less than the amount owing on the first trust deed. The

7  Debtors' have filed a Motion to Determine Secured Status of the creditors with interests in the Real

8  Property and, upon the Court's determination that the interest of BAC Home Loans Servicing is

9  completely unsecured, the sale can go forward with payment solely to GMAC Mortgage.

10  **II**

11  **Statement of Facts**

12      On January 18, 2010, James N. Knowles and Sara Knowles filed a Voluntary Petition under

13  Chapter 11 of the United States Bankruptcy Code, in the United States Bankruptcy Court, Central

14  District of California.  Since said date the Debtors have been, and continue to be, Debtors in

15  Possession.

16      Prior to the filing of the Debtors' Chapter 11 Petition, and on or about November 1, 2006, the

17  Debtors purchased the Real Property.  On the Real Property is a four unit residential apartment

18  building, which is leased out by the Debtors for income.  The Real property is not, and never has

19  been, the principal residence of the Debtors.

20      At the time of purchasing the Real Property, the Debtors obtained a loan from GreenPoint

21  Mortgage Funding, Inc., in the principal amount of $759,200.00, to finance the purchase. This Loan

22  was subsequently assigned to GMAC Mortgage, who is now the owner and beneficiary thereof. True

23  and correct copies of the Adjustable Rate Note, Deed of Trust and Assignment of Deed of Trust are

24  attached to the Declaration of James N. Knowles, respectively marked Exhibits "1", "2" and "3", and

25  incorporated herein by this reference.

26      At the same time as the Debtors purchased of the Real Property and obtaining the loan from

27  GMAC Mortgage, the Debtors also obtained a home equity line of credit from GreenPoint Mortgage

28  Funding, Inc., up to the principal amount of $94,900.00, which loan was secured by a junior Deed of

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

4

1  Trust recorded against the Real Property. True and correct copies of the Home Equity Line of Credit

2  Agreement and Promissory Note (Secondary Mortgage Loan) and the Open-End Deed of Trust –

3  Line of Credit Trust Deed, are attached to the Declaration of James N. Knowles, respectively marked

4  Exhibits "4" and "5", and incorporated herein by this reference.

5  The line of credit secured by the junior lien was subsequently assigned to Countrywide Home

6  Loans and is now owned by BAC Home Loans Servicing, LP.

7  At the time of the Debtors' filing of the immediate Chapter 11 Petition, they scheduled the

8  Real Property as having a value of $650,000.00. Subsequently, the Debtors sought to sell the Real

9  Property and obtained an offer in excess of their stated value. The offer to purchase was for

10  $680,000.00, thus, at the present time the Debtors have concluded that the Real Property has a current

11  value of $680,000.00. True and correct copies of the Debtors' Schedule "A" and the Residential

12  Income Property Purchase Agreement and Joint Escrow Instructions are attached to the Declaration

13  of James N. Knowles, respectively marked Exhibits "6" and "7", and incorporated herein by this

14  reference.

15  On or about May 11, 2010, GMAC Mortgage filed a proof of Claim with the United States

16  Bankruptcy Court, Central District of California, claiming a total obligation owing by the Debtors of

17  $866,721.22. A true and correct copy of the Proof of Claim, without exhibits, is attached to the

18  Declaration of James N. Knowles, marked Exhibit "8" and incorporated herein by this reference.

19  On or about April 2, 2010, BAC Home Loans Servicing filed a proof of Claim with the

20  United States Bankruptcy Court, Central District of California, claiming a total obligation owing by

21  the Debtors of $101,631.74. A true and correct copy of the Proof of Claim, without exhibits, is

22  attached to the Declaration of James N. Knowles, marked Exhibit "9" and incorporated herein by this

23  reference.

24  The Debtors' decided that it was in the estate's best interest to sell the Real Property and the

25  Debtors' enlisted the help of Keller Williams Realty to locate a buyer for the Real Property. On April

26  2, 2010, the Debtors' accepted an offer to purchase from Joe C. Teo and Thuy T. Tran to purchase the

27  Real Property on the terms and conditions set forth in the Purchase Agreement (Exhibit "7").

28  ///

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692  FAX: (626) 359-3728

1    The Debtors have determined that the proposed sale should not subject to higher and better

2    bids because the Debtors believe that the Buyers' bid constitutes the highest bid; however, in order to

3    ensure that the Buyers' bid is the highest bid, a copy of this Motion will be served on all potential

4    buyers who had previously shown interest in purchasing the Real Property.

5    Based on current estimates, Debtors estimate that the sale proceeds will be distributed as

6    follows:

7    Sales Price:                                    $680,000.00

8    Less:

9    Estimated Property Taxes:              00.00

10   Commission:                           $40,800.00

11   Estimated Costs of Sale:              $5,000.00

12   Subtotal:                            $634,200.00

13   Payable to GMAC Mortgage:           $634,200.00

14   Payable to BAC Home Loans              0.00

15   The Debtors hereby seek authorization to pay real estate brokers, Keller Williams Realty and

16   Coldwell Banker Dynasty, a commission of $40,800.00 (6.00% of the sales price).

17

18                                            **III**

19              **Sale of the Real Property is Authorized Under 11 U.S.C. §363(b)(1)**

20   *11 U.S.C. §363(b)(1)* provides that the "trustee, after notice and a hearing, may use, sell, or

21   lease, other than in the ordinary course of business, property of the estate."

22   The following factors are considered in the approval of the proposed sale: (1) a sound

23   business purpose justifying the sale; (2) an accurate and reasonable notice of the sale; (3) the price is

24   adequate, i.e. fair and reasonable; and (4) the sale is in good faith. *In re Wild Horse Enterprises, Inc*

25   136 B.R. 830, 841-842 (Bankr. C. D. Cal 1991).

26   The Debtors in Possession, acting in the capacity of the trustee, believe that their business

27   decision to sell the Real property is in the best interest of the estate and creditors.

28   ///

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692  FAX: (626) 359-3728

6

1.    Sound Business Decision:

In this case, the Real Property, which is a four unit apartment building, is clearly diminishing in value following the recent downturn of the real estate market. See *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (BAP 9th Cir. 1988) (one of the factors in determining whether a sound business purpose exists for the sale of property is whether the property is increasing or decreasing in value).

The Debtors have identified the Real Property as one which is not generating sufficient income to sustain itself. A prompt sale of the Real Property at the highest market price benefits both the estate and creditors. Thus, the property should be sold pursuant to *11 U.S.C. §363(b)*.

2.    Accurate and reasonable notice:

Debtors will serve a copy of this Motion on all parties as required by FRBP and the local rules. If any party objects to the Motion, such party will have the opportunity to file a responsive pleading in this case.

In addition, Debtors' will serve a copy of this Motion on all potential buyers who had previously expressed interest in purchasing the Real Property, so that any potential buyers may submit a higher offer or backup offer.

3.    Fair and reasonable price:

"It is well-established principle of bankruptcy law that the objective of bankruptcy sales and the [Trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlantic Packaging Products, Inc.* 99 B.R. 124, 131 (Bankr. N.D. Ga 1988); See also *In re Wild Horse Enterprises*, 136 B.R. at 841.

In this case, the proposed sale will render the highest value for the Real Property. Debtors believe that the proposed sales price negotiated between unrelated persons at arms length represents the true current value of the Real Property. The Debtors further believe that the terms and conditions of the proposed sale, including the price and all contingencies, are in the best interest of the estate. Moreover, Debtors certify that they have not been contacted by any potential over-bidders and that, in the Debtors' business judgment, there are no viable alternative purchasers. Furthermore, a copy of

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692  FAX: (626) 359-3728

7

1 this Motion will be served on all potential buyers who had previously shown interest in purchasing

2 the Real Property.

3      In addition, the costs and commissions associated with the sale are reasonable, which is

4 estimated to be less than 7.00% of the sales price. Hence, the Debtors submit that the proposed sale

5 will yield a fait and reasonable value for the Real Property.

6      4.    Good Faith:

7      "Good Faith" encompasses fair value, and further speaks to the integrity of the transaction. *In*

8 *re Wild Horse Enterprises*, 136 B.R. at 842. In this case, the sale of the Real property is conducted in

9 good faith because the sale will be subject to inspection by the Court, all secured and unsecured

10 creditors in this case, and all potential buyers who have previously shown interest in the Real

11 Property. This will ensure that the Buyers will be paying the highest dollar amount for the Real

12 Property. Moreover, the Debtors have no connections, relations or prior dealings with the Buyers.

13 Furthermore, the Debtors do not contemplate having any future dealings with the Buyers other than

14 the subject sale. Under these circumstances, the sale of the Real Property has been proposed in good

15 faith and for the benefit of the estate.

16                                IV

17 **11 U.S.C. Section 363(f) Allows for a Sale of the Real Property Free and Clear of Liens**

18 *11 U.S.C. §363(f)* provides, in relevant part, as follows:

19      The trustee may sell property under subsection (b) . . . of this section free and clear of

20      any interest in such property of an entity other than the estate, only if –

21           (1)    applicable nonbankruptcy law permits the sale of such property free

22                  and clear of such interest;

23           (2)    such entity consents;

24           (3)    such interest is a lien and the price at which such property is to be sold

25                  is greater than the aggregate value of all liens on such property;

26           (4)    such interest is in bona fide dispute; or

27           (5)    such entity could be compelled, in a legal or equitable proceeding, to

28                  accept a money satisfaction of such interest.

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX (626) 359-3728

8

1   *Section 363(f)* was drafted in the disjunctive, thus the Debtors need to satisfy only one of the

2   five subsections of *Section 363(f)* in order for the sale to be free and clear of all interests.

3       In this case, the interest of BAC Home Loans Servicing will be avoided by a companion

4   Motion of the Debtors to determine the secured status of BAC.  If granted, BAC will become

5   completely unsecured and will no longer have an interest in the Real Property.

6       The Debtors are negotiating with GMAC Mortgage, the senior lien holder on the Real

7   Property and anticipates having their consent to the sale free an clear.

8                                      **V**

9                                 **Conclusion**

10      Based upon the code sections cited above and the Debtors' statement of value of the Real

11  Property and the proposed sale it is respectfully requested of this Court that the sale on the terms and

12  conditions requested by the debtors be approved.

13  Date: July 5, 2010                           **MICHAEL A. CISNEROS**
                                                 **Attorney at Law**
14

15
                                                 By:
16                                                   **Michael Anthony Cisneros**
                                                     Attorneys for Debtors
17                                                   James N. Knowles and Sara Knowles

18

19

20

21

22

23

24

25

26

27

28

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

                                      9

## DECLARATION OF JAMES N. KNOWLES

I, James N. Knowles, declare:

1.      I am the Debtor in the immediate Chapter 11 case. I am a resident of the state of California and am an individual over the age of eighteen years. I have first hand knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify to the truth of the matters set forth herein.

2.      On January 18, 2010, I and Sara Knowles filed a Voluntary Petition under Chapter 11 of the United States Bankruptcy Code, in the United States Bankruptcy Court, Central District of California. Since said date we have been, and continue to be, Debtors' in Possession.

3.      Prior to the filing of our Chapter 11 Petition, and on or about November 1, 200, we purchased the real property located at 1224 Corson Street, Pasadena, California ("Real Property"). On the Real Property is a four unit residential apartment building, which we rent out for income. The Real property is not, and never has been  used by us as our principal residence

4.      At the time of purchasing the Real Property, we obtained a loan from GreenPoint Mortgage Funding, Inc., in the principal amount of $759,200.00, to finance the purchase. This Loan was subsequently assigned to GMAC Mortgage, who is now the owner and beneficiary thereof. True and correct copies of the Adjustable Rate Note, Deed of Trust and Assignment of Deed of Trust are attached hereto, respectively marked Exhibits "1", "2" and "3", and incorporated herein by this reference.

5.      At the same time as we purchased of the Real Property and obtained the loan from GMAC Mortgage, we also obtained a home equity line of credit from GreenPoint Mortgage Funding, Inc., up to the principal amount of $94,900.00, which loan was secured by a junior Deed of Trust recorded against the Real Property. True and correct copies of the Home Equity Line of Credit Agreement and Promissory Note (Secondary Mortgage Loan) and the Open-End Deed of Trust – Line of Credit Trust Deed, are attached hereto, respectively marked Exhibits "4" and "5", and incorporated herein by this reference.

6.      The line of credit secured by the junior lien was subsequently assigned to Countrywide Home Loans and is now owned by BAC Home Loans Servicing, LP.

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692 FAX: (626) 359-3728

1      7.    At the time of our filing of the immediate Chapter 11 Petition, we scheduled the Real

2 Property as having a value of $650,000.00.  Subsequently, we sought to sell the Real Property and

3 received an offer in excess of our stated value.  The offer to purchase was for $680,000.00, thus, at

4 the present time we have concluded that the Real Property has a current value of $680,000.00.  True

5 and correct copies of our Schedule "A" and the Residential Income Property Purchase Agreement

6 and Joint Escrow Instructions are attached hereto, respectively marked Exhibits "6" and "7", and

7 incorporated herein by this reference.

8      8.    On or about May 11, 2010, GMAC Mortgage filed a proof of Claim with the United

9 States Bankruptcy Court, Central District of California, claiming a total obligation owing by the

10 Debtors of $866,721.22.  A true and correct copy of the Proof of Claim, without exhibits, is attached

11 hereto, marked Exhibit "8" and incorporated herein by this reference.

12     9.    On or about April 2, 2010, BAC Home Loans Servicing filed a proof of Claim with

13 the United States Bankruptcy Court, Central District of California, claiming a total obligation owing

14 by the Debtors of $101,631.74.  A true and correct copy of the Proof of Claim, without exhibits, is

15 attached hereto, marked Exhibit "9" and incorporated herein by this reference.

16     10.    We decided that it was in the estate's best interest to sell the Real Property and the we

17 enlisted the help of Keller Williams Realty to locate a buyer for the Real Property.  On April 2, 2010,

18 we accepted an offer to purchase from Joe C. Teo and Thuy T. Tran to purchase the Real Property on

19 the terms and conditions set forth in the Purchase Agreement (Exhibit "7").

20     11.    We have determined that the proposed sale should not subject to higher and better bids

21 because we believe that the Buyers' bid constitutes the highest bid; however, in order to ensure that

22 the Buyers' bid is the highest bid, a copy of this Motion will be served on all potential buyers who

23 had previously shown interest in purchasing the Real Property.

24 ///

25 ///

26 ///

27 ///

28 ///

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE 12
MONROVIA, CALIFORNIA 91016
(626) 359-3692  FAX: (626) 359-3728

11

12.     Based on current estimates, we estimate that the sale proceeds will be distributed as follows:

Sales Price:                           $680,000.00

Less:

      Estimated Property Taxes:          00.00

      Commission:                    $40,800.00

      Estimated Costs of Sale:        $5,000.00

      Subtotal:                      $634,200.00

Payable to GMAC Mortgage:          $634,200.00

Payable to BAC Home Loans            0.00

13.     We hereby seek authorization to pay real estate brokers, Keller Williams Realty and Coldwell Banker Dynasty, a commission of $40,800.00 (6.00% of the sales price).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  _5_  day of July, 2010 at Monrovia, California.

By: _James N. Knowles_

James N. Knowles

MICHAEL A. CISNEROS, Attorney at Law
50 WEST LEMON AVENUE, SUITE [2
MONROVIA, CALIFORNIA 91016
(626) 359-3692  FAX: (626) 359-3728

12

**EXHIBIT "1"**

*Knowles*

# ADJUSTABLE RATE NOTE
### Monthly Treasury Average Index - Payment and Rate Caps

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

November 1, 2006             Los Alamitos              California
[Date]                        [City]                    [State]

1224 Corson Street #1 - 4, Pasadena, CA  91106

[Property Address]

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 759,200.00              (this amount is called "Principal"), plus interest, to the order of Lender. Lender is GreenPoint Mortgage Funding, Inc.

I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
### (A) Interest Rate
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        3.000 %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates
The interest rate I will pay may change on the first day of January, 2007        , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

### (C) Interest Rate Limit
My interest rate will never be greater than         12.000%.

### (D) Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board entitled "Selected Interest Rates (h.15)" (the "Monthly Yields").
The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes
Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding three and one-half percentage points (.    3.500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

OPTNCA-OA (06/06) GreenPoint Mortgage Funding, Inc.

Page 1 of 5

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **January 1, 2007**

I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **December 1, 2036**        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 79363, City of Industry, CA 91716-9363**

                                                                                                              or

at a different place if required by the Note Holder.

#### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. **$3,200.82**
This amount may change.

#### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of **January, 2008**        , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

#### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last monthly payment due before the Payment Change Date.

#### (E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

#### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to 110% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

#### (G) Required Full Payment

On **01/01/2012** and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

### 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

### 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7. BORROWER'S FAILURE TO PAY AS REQUIRED

#### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 10    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    6.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

#### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

#### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

#### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

#### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

### 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

OPTNCA-OA (06/06) GreenPoint Mortgage Funding, Inc.
Page 3 of 6

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Sara Knowles_ (Seal)

Sara Knowles                          -Borrower

_James Nathaniel Knowles_ (Seal)

James Nathaniel Knowles               -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

*[Sign Original Only]*

OPTNCA-OA (06/06) GreenPoint Mortgage Funding, Inc.
Page 5 of 5

**EXHIBIT "2"**

▲    This page is part of your document - DO NOT DISCARD    ▲

# 06 2511253

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA

## 11/14/06 AT 08:00AM

## TITLE(S) :

▲    ▲

L E A D    S H E E T

| **FEE** | | **D.T.T.** |
|---|---|---|
| Code 01 - 79.00 | Code T008 - 001 | |
| Code 18 - 04.00 | | |
| Code 20 - 02.00 | | |

**CODE**
**20**

**CODE**
**19**

**CODE**
**9**_____    *Grand Total = $85.00*    *Page Count = 25*

**Assessor's Identification Number (AIN)**
**To be completed by Examiner OR Title Company in black Ink.**    **Number of AIN's Shown**

▲    **THIS FORM IS NOT TO BE DUPLICATED**    ▲

RECORDED AT THE REQUEST OF
CHICAGO TITLE COMPANY

Recording Requested By:
**GreenPoint Mortgage Funding, Inc.**
Return To:
**GreenPoint Mortgage Funding, Inc.**
**981 Airway Court, Suite E**
**Santa Rosa, CA 95403-2049**



11/14/06

**20062511253**

Prepared By:
**GreenPoint Mortgage Funding, Inc.**
**100 Wood Hollow Drive,**
**Novato, CA 94945**

——————[Space Above This Line For Recording Data]——————

# DEED OF TRUST

MIN 100013800910804737

## DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **November 1, 2006**
together with all Riders to this document.
**(B) "Borrower"** is **James Nathaniel Knowles and Sara Knowles, Husband and wife as joint Tenents**

Borrower's address is **372 LAUN, Altadena, CA 91001**
. Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **GreenPoint Mortgage Funding, Inc.**

Lender is a **Corporation**
organized and existing under the laws of **the State of New York**

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS     Form 3005  1/01

🆅🅼🅿 -6A(CA) (0207) 01
Page 1 of 15
         VMP Mortgage Forms, Inc

*3*

Lender's address is 100 Wood Hollow Drive, Novato, CA 94945

(D) "Trustee" is Marin Conveyancing Corp.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated November 1, 2006
The Note states that Borrower owes Lender seven hundred fifty-nine thousand two
hundred and 00/100                Dollars
(U.S. $759,200.00     ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than December 1, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider [x] 1-4 Family Rider | |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |
| [ ] Occupancy Rider | [x] Interim Interest Rider | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

LOS ANGELES,CA            Page 3 of 26            Printed on 3/5/2010 9:04:49 AM
Document: TD 2006.2511253

*4*

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the       **County**                    of              **Los Angeles**                  :
          [Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]

**As more particularly described in exhibit "A" attached hereto and made a part hereof.**

Parcel ID Number: **5738-015-076**                        which currently has the address of
**1224 Corson Street #1 - 4**                                                          [Street]
**Pasadena**                                      [City], California **91106**        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

-6A(CA) (0207).01                        Page 3 of 15                        Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

-6A(CA) (0207).01          Page 4 of 15          Form 3005  1/01

6

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6A(CA) (0207).01                    Page 5 of 15                    Form 3005   1/01

7

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

VMP -6A(CA) (0207) 01      Page 6 of 15      Form 3005 1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(CA) (0207) 01                    Page 7 of 15                    Form 3006   1/01

*9*

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

10

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

 -6A(CA) (0207) 01       Page 9 of 15       Form 3005  1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6A(CA) (0207).01    Page 10 of 15    Form 3005    1/01

*12*

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

-6A(CA) (0207) 01                    Page 11 of 15                    Form 3005   1/01

13

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(CA) (0207).01          Page 12 of 15          -Form 3005   1/01

*14*

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

-6A(CA) (0207).01 ®      Page 13 of 15      Form 3005   1/01

15

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____  1. 16/06
                                         Sara Knowles                (Seal)
                                                                     -Borrower

_____    _____ (Seal)
                                         James Nathaniel Knowles      -Borrower

_____ (Seal)     _____ (Seal)
                         -Borrower                            -Borrower

_____ (Seal)     _____ (Seal)
                         -Borrower                            -Borrower

_____ (Seal)     _____ (Seal)
                         -Borrower                            -Borrower

-6A(CA) (0207) 01                  Page 14 of 15              Form 3005  1/01

*16*

State of California
County of Los Angeles          } ss.

On  11-6-06                    before me, Dori Magallanes, Notary Public
                                              personally appeared

Sara Knowles, James Nathaniel Knowles  ——————————————

                                              , ~~personally known to me~~
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that ~~he/she~~/they executed the same in ~~his/her~~/their
authorized capacity(ies), and that by ~~his/her~~/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Dori Magallanes_ (Seal)

DORI MAGALLANES
Commission # 1404055
Notary Public - California
San Bernardino County
My Comm. Expires Mar 7, 2007

-6A(CA) (0207).01          Page 15 of 15          Form 3006  1/01

# EXHIBIT A

*17*

THAT PORTION OF LOT 46, IN BLOCK "B" OF RIGGINS BROTHERS SUBDIVISION OF A PART
OF THE GROGAN TRACT, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, AS PER MAP RECORDED IN BOOK 36, PAGE 22 OF MISCELLANEOUS RECORDS,
IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, CONVEYED TO THE STATE OF
CALIFORNIA BY DEED 48045 RECORDED IN BOOK D4368, PAGE 597 OF OFFICIAL RECORDS,
IN SAID OFFICE AND THOSE PORTIONS OF LOTS 46, 47 AND 48 IN SAID BLOCK "B"
CONVEYED TO SAID STATE BY DEED 48046 RECORDED IN BOOK D4383, PAGE 776 OF
OFFICIAL RECORDS, IN SAID OFFICE, ALL OF THE ABOVE PORTIONS, AS A WHOLE
BOUNDED NORTHERLY BY THE FOLLOWING DESCRIBED LINE:

COMMENCING AT THE INTERSECTION OF THE CENTER LINE OF MAPLE STREET 50.00 FEET
WIDE AS SHOWN ON SAID MAP WITH THE CENTER LINE OF MICHIGAN AVENUE 50.00 FEET
WIDE SHOWN AS ELLIS AVENUE ON SAID MAP; THENCE ALONG LAST SAID CENTER LINE
SOUTH 0°42'30" EAST 352.89 FEET; THENCE AT RIGHT ANGLES NORTH 89°17'3' EAST
25.00 FEET TO A POINT IN THE WEST LINE OF SAID LOT 46 AND THE TRUE POINT OF
BEGINNING; THENCE NORTHEASTERLY ALONG A CURVE TANGENT TO SAID WEST LINE AT
SAID POINT CONCAVE SOUTHEASTERLY AND HAVING A RADIUS OF A5.00 FEET; THROUGH AN
ANGLE OF 89°47'30", AN ARC DISTANCE OF 23.51 FEET; THENCE NORTH 89°05'00" EAST
221.05 FEET TO A TANGENT CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF
3027.00 FEET; THENCE EASTERLY ALONG SAID CURVE THROUGH AN ANGLE OF 0°55'16" AN
ARC DISTANCE OF 48.66 FEET; THENCE SOUTHEASTERLY ALONG A REVERSE CURVE CONCAVE
SOUTHWESTERLY AND HAVING A RADIUS OF 15.00 FEET FROM A TANGENT WHICH BEARS
NORTH 83°09'44" EAST THROUGH AN ANGLE OF 91°00'12" AN ARC DISTANCE OF 23.86 FEET
TO THE POINT OF TANGENCY THEREOF WITH THE EAST LINE OF LOT 33 IN SAID BLOCK
"B", SAID LAST MENTIONED POINT BEING DISTANT ALONG SAID EAST LINE SOUTH
0°42'04" EAST 24.85 FEET FROM THE NORTHEAST CORNER OF SAID LOT 33.

**EXHIBIT "3"**

RECORDING REQUESTED BY:
Mortgage Electronic Registration Systems, Inc.
Solely as Nominee for GreenPoint Mortgage Funding, Inc.

RECORDED MAIL TO: Pite Duncan, LLP
4375 Jutland Drive, Suite 200
P.O. Box 17933
San Diego, CA 92177-0933


APN: 5738-015-076

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to GMAC Mortgage LLC all beneficial interest under that certain Deed of Trust dated November 1, 2006, executed by James Nathaniel Knowles and Sara Knowles, Husband and Wife as Joint Tenants, to Marin Conveyancing Corp. as trustee, for Mortgage Electronic Registration Systems, Inc. Solely as Nominee for GreenPoint Mortgage Funding, Inc., as beneficiary, and recorded as Instrument No. 06 2511253 on November 14, 2006, in the State of California, Los Angeles County Recorder's Office. Together with the Note or Notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

Dated: _9/2/09_

Mortgage Electronic Registration Systems, Inc. Solely as Nominee for GreenPoint Mortgage Funding, Inc.
By: _____
Its: _Sandy Broughton Asst. Secret___

State of _Pennsylvania_ )
County of _Philadelphia_ ) ss.

On _Sept 2, 2009_ before me, _Verdine A. Freeman_, personally appeared _Sandy Broughton_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Verdine A. Freeman_
Notary Public

(This Area for Official Notary Seal)

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Verdine A. Freeman, Notary Public
City Of Philadelphia, Philadelphia County
My Commission Expires Nov. 16, 2010
Member, Pennsylvania Association of Notaries